**UNITED STATES of America, Appellee**

**v.**

**Kevin DeWayne MOBLEY, Appellant.**

**UNITED STATES of America, Appellee,**

**v.**

**Erick Conta BARRETT, Appellant.**

**Nos. 82–5071, 82–5072.**

United States Court of Appeals, Fourth Circuit.

Argued Nov. 8, 1982.

Decided Jan. 25, 1983.

Certiorari Denied April 25, 1982.

See 103 S.Ct. 1883, 1884.

Stanley J. Reed, Asst. Federal Public Defender, Baltimore, Md. (Fred Warren Ben-

---

nett, Federal Public Defender, Baltimore, Md., on brief), for appellant Mobley.

Stephen N. Goldberg, Baltimore, Md., on brief, for appellant Barrett.

Barbara S. Sale, Asst. U.S. Atty., Baltimore, Md. (J. Frederick Motz, U.S. Atty., Baltimore, Md., on brief), for appellee.

Before WINTER, Chief Judge, CHAPMAN, Circuit Judge, and BUTZNER, Senior Circuit Judge.

CHAPMAN, Circuit Judge:

Defendants appeal their convictions of armed robbery of a federally insured bank in the District of Maryland on October 15, 1981. They contend that the stop of the automobile in which they were riding was not based on a reasonably founded suspicion and was therefore unlawful, that their arrest was made without probable cause, and that the fruits of the search warrant incident to the stop and arrest should have been suppressed. We find the stop, the arrest and the search were all legal and affirm the convictions.

Following indictment charging each defendant with the armed robbery of the Maryland National Bank of Jefferson, Maryland the defendants moved to suppress evidence seized from the trunk of the automobile in which they were riding at the time of their arrest, and all fruits of said seizure, including identifications resulting from a "show up" at the bank shortly after their arrest. Hearings on the motions were conducted over a period of seven days, following which the court denied the motions to suppress. Each appellant waived a jury trial and agreed to proceed to a trial before the court on stipulated facts together with the testimony taken at the motions hearings. At the conclusion of the trial appellants were found guilty on all counts.

I

Shortly before 10:00 a.m. on October 15, 1981 the Maryland National Bank in Jefferson, Maryland was robbed at gun point of approximately $21,000. Immediately before the robbery a customer of the bank looked out of the window of the bank and saw a maroon automobile containing four black males drive into the bank parking lot at a high rate of speed in the exit portion of the driveway. She concluded that these individuals were about to rob the bank and commented to another witness to this effect. Moments later two or three black males entered the bank, each wearing a stocking mask and carrying a gun. After taking approximately $21,000 in cash and putting it into a cloth pillowcase the robbers locked the victims in the bank vault and none of the victims observed the getaway.

A few moments later the police arrived and broadcast a report of the armed robbery advising police in the area to be on the lookout for a maroon automobile carrying four black males. Special agent James E. Duffy of the Hagerstown, Maryland office of the FBI heard this broadcast. Jefferson is a small rural community in Frederick County, Maryland, not far from the junction of Routes 340 leading to Baltimore and 270 leading to Washington.

A few moments after the broadcast a Maryland state police helicopter located the maroon automobile abandoned in a field less than one mile from the bank. The investigating officers were therefore aware that the getaway car had been abandoned by the bank robbers and that they were probably leaving the area in a second automobile.

When special agent Duffy heard the broadcast he immediately headed toward the bank to assist in the investigation. Some ten months earlier, agent Duffy had been involved in the investigation and prosecution of appellant Kevin Dewayne Mobley in connection with another bank robbery in the Frederick County area. It was Duffy's belief that a 1976 or 1977 white Lincoln automobile had been used in connection with the prior robbery. A white Lincoln with District of Columbia license plates had been seen in the vicinity of the bank previously robbed and had raised the suspicion of some witnesses. Shortly after the prior robbery a state patrolman had spotted a

white Lincoln traveling Route 270 toward Washington, but the car was not stopped. This car was later traced to a District of Columbia resident by the name of Shirley Mae Wallace. From Duffy's investigation of the prior robbery he was of the opinion that Mobley had used the Wallace white Lincoln in the prior robbery and that Mobley was an active member of Wallace's gang of criminal associates. Mobley was acquitted on the prior bank robbery charge.

Several weeks before the October 15, 1981 robbery agent Duffy was advised by an FBI agent in the Washington office that a reliable informant had reported that the Shirley Wallace gang was planning another bank robbery in Duffy's area. He had received no further information until he heard the police radio report of the robbery on October 15, 1981 in Jefferson, but as he traveled toward the bank he recalled the prior robbery, the white Lincoln and the tip from the confidential informant that had been relayed to him. Concluding that this must be the work of the Shirley Wallace gang, agent Duffy broadcast on the Frederick County channel of the state police radio band a request that officers be on the lookout for a 1976 or 1977 white Lincoln automobile heading south on Route 270. Several minutes later a white Lincoln was spotted heading south on Route 270 near the County line. When observed by a state patrolman the Lincoln appeared to have only one occupant, Kevin DeWayne Mobley, the driver. When the officer first spotted the car he noted that it had only one license tag which aroused some suspicion, because it is not uncommon for bank robbers to steal or switch license tags for use on an automobile in the commission of a crime or leaving the scene of a crime.

The officer who spotted the car reported his observation. Lieutenant Yinger of the Frederick Barracks of the state police advised the officers that possibly other persons were lying down in the floorboard of the car and told the officers to make a stop. Officers Eiker and Etheridge stopped the Lincoln, and because of a suspected felony they drew their weapons as they approached the car.

As officer Etheridge approached from the rear he observed a passenger in the right front seat raise his head and peer over the dash. Officer Eiker also saw movement in the front passenger seat and observed a hand placed on the dashboard. At this moment a third officer, Hunnicutt, had arrived at the scene and noticed that there were other passengers in the car. The officers directed all occupants to exit the car and found Kevin Dewayne Mobley at the wheel, Larry Tyrone Hagans, Jr. in the passenger seat and appellant Erick Conta Barrett in the back seat. The remains of a stocking mask were around Barrett's neck as he exited the car. None of the individuals had any identification and each refused to give his name.

Officer Hunnicutt asked about the alleged fourth bank robber. He was concerned that the fourth robber might be hiding in the trunk. He also remembered that a police captain had been killed by a criminal hiding in a car trunk, so he opened the trunk. He did not find the fourth suspect, but saw in plain view a number of guns and a cloth pillowcase stuffed with currency wrapped in bank straps.

The three suspects were immediately taken to the state police barracks in Rockville and the car, with the money and guns in the trunk, was towed to the Frederick barracks. The robbers were taken back to the bank and Mobley and Barrett were positively identified by bank employees. These facts were found by the court and are amply supported by the evidence.

## II

Since the officers making the stop were acting upon orders from Lieutenant Yinger and the direction of agent Duffy to be on the lookout for a 1976 or 1977 white Lincoln heading south on Route 270, we must decide whether Duffy's broadcast and Yinger's order to stop the white Lincoln meet the test of *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1967) that "... in justifying the particular intrusion [the stop] the police officer must be able to point

to specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant that intrusion."

At the time Duffy broadcast the lookout he either knew or believed the following: (1) That an armed bank robbery had been committed in Jefferson; (2) that it appeared to have been perpetrated by four black males; (3) that black bank robbers in that area of rural Maryland usually came from Baltimore or Washington; (4) that an exceedingly reliable informant had reported recently that the Shirley Wallace gang was planning a robbery in Duffy's area; (5) that Kevin Dewayne Mobley was a member of the Shirley Wallace gang; (6) that Shirley Wallace owned a 1976 or 1977 white Lincoln; (7) that less than a year before, the same gang had committed a bank robbery in the Frederick area; and (8) that Shirley Wallace's white Lincoln had been involved in the prior robbery and had been spotted headed south toward Washington on Route 270 shortly thereafter.

Lieutenant Yinger, when he directed the patrolman to stop the white Lincoln, was aware: (1) That a car matching the description given by agent Duffy was seen proceeding south on Route 270; (2) that it appeared to be occupied by one black male; (3) that it was not uncommon for criminals to lie in the floor of a car in order to conceal themselves; (4) that the suspect vehicle bore only one license tag; (5) that it was not uncommon for criminals to steal or switch one license tag; (6) that bank robbers usually involve the use of two automobiles, because the robbers wish to abandon the automobile seen by witnesses at the bank and make their getaway in a vehicle that has not been observed; and (7) that the maroon car had been found abandoned.

■ We find that the facts known by agent Duffy at the time of his broadcast were sufficiently specific and articulable when taken with the rational inferences to be drawn therefrom to give rise to a reasonable suspicion that a white 1976 or 1977 Lincoln automobile had been involved in the bank robbery and would be headed south on Route 270.

In considering the totality of the circumstances as it appeared to the investigating officers at the time, Lieutenant Yinger had sufficient facts available to give rise to a reasonable suspicion that the white Lincoln spotted by officer Eiker headed south on Route 270 was engaged in criminal activity justifying an investigative stop of the car under *Terry v. Ohio.*

In the present case the officers were involved in a known and ongoing crime. They were conducting a minute-by-minute investigation. They knew the bank robbers were in the immediate vicinity and hoped to be able to apprehend them before they could slip away.

It is obvious that the investigating officers and those directly responsible for ordering the stop of the white Lincoln had a particularized and objective basis for suspecting the white Lincoln to be involved in the robbery. The assessment to be made by the officers is set forth in *U.S. v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981):

The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment must be based upon all of the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of law breakers. From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person.

The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain commonsense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis

by scholars, but as understood by those versed in the field of law enforcement.

The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing.

The appellants argue that the white Lincoln was stopped on the basis of a hunch or just blind luck. The government contends that the stop was a result of good police work. This court agrees that it was good police work and met both prongs of the *Cortez* test. Agent Duffy was aware of the "modes or patterns" of bank robbers in general and the Shirley Wallace gang in particular. He had the information as enumerated above. This information supports the probability that a white Lincoln had been used in a bank robbery that had just occurred. The particular individual stopped was Kevin Dewayne Mobley, who was suspected as being a member of the Shirley Wallace gang, had been indicted in a prior bank robbery in the same area and was driving the white Lincoln in the direction of Washington immediately following the October 15, 1981 bank robbery. The only luck involved the use of the white Lincoln. The vehicle used on October 15, 1981 did not belong to Shirley Wallace but was owned by Larry Tyrone Hagans, the father of Larry Tyrone Hagans, Jr., the juvenile found in the front seat of the car at the time of the stop. Mr. Hagans, Sr. was not involved in the scheme to rob the bank. However, this coincidence does not undermine the inferences that were properly drawn and adequately supported that a white Lincoln probably was used in the bank robbery.

### III

Since the officers at the scene were advised that there had been four bank robbers, and since two of the individuals in the car had been trying to conceal themselves, and one of them still had the stocking mask around his neck, it was perfectly reasonable for the officers to search into the automobile trunk for the fourth suspect. *United States v. Muhammad,* 658 F.2d 249 (4th Cir.1981).

The total elapsed time in stopping the white Lincoln, unloading the occupants and searching the vehicle was no more than five minutes. Although the exact moment of the arrest of the suspects is uncertain, it occurred sometime during the five minutes. Once the two suspects, who had been hiding in the car came forth, and one had a stocking mask around his neck, there were sufficient facts and circumstances to justify the officers' belief that they had apprehended the bank robbers. This belief became certain a moment later when the trunk was opened revealing the bank money and the weapons used in the robbery.

Defendants contend that this case is controlled by *U.S. v. Rias,* 524 F.2d 118 (5th Cir.1975). However, *Rias* involved a completely different factual situation. *Rias* and his companion were stopped and their vehicle searched because they were black males driving a black or blue Chevrolet near a Farm Store in Miami, when the police officer knew that there had been a series of Farm Store robberies, the last of which occurred at least two weeks and possibly a month earlier. The officer in *Rias* had no other information to justify the stop and attempted to justify the search of the automobile upon inconsistent stories by Rias and his companion as to where they were going. *Rias* did not involve the investigation of a bank robbery which had occurred within the past hour or so. *Rias* did not involve a stop after checking with higher authority, which had the benefit of the accumulation of all of the facts which have been mentioned herein. The search in *Rias* was not for the protection of the officers, when the officers knew that there was a fourth participant involved, and Rias nor his companion exited the vehicle with the remains of a stocking mask around the neck.

Since the stop was based upon specific and articulable facts giving rise to a reasonable suspicion that the occupants of the

Lincoln were engaged in criminal activity, and the arrest was made upon probable cause in connection with an ongoing investigation, both were proper and the fruits of the search of the automobile were admissible at trial. Judgment is, therefore,

AFFIRMED.