[No. B036678. Second Dist., Div. Seven. Mar. 29, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT EUGENE LAZANIS, Defendant and Appellant.

**COUNSEL**

Robert B. LeCorvec, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Robert M. Myers, City Attorney, and Cesar A. Bertaud, Deputy City Attorney, for Plaintiff and Respondent.

## OPINION

**KOLTS, J.\***—This case has been presented to us after conviction of the defendant for driving a motor vehicle while under the influence of alcohol. The conviction was affirmed by the appellate department of the superior court and, because of perceived significant questions of law was certified to this court for consideration.

## FACTS AND PROCEEDINGS BELOW

In the early morning hours of February 4, 1986, the Santa Monica Police Department received a telephone call from Mr. Greenbank, a private citizen, relaying information from another person that there was a possible burglary in progress at the Bay City Van and Storage at an address on Second Street in Santa Monica. This information was transmitted in a radio broadcast by a Ms. Kujuo which was received by Officers Howe and Brown among others who proceeded toward the location. Officer Howe was the first to arrive there. She observed the situation and transmitted the following radio message: "A vehicle pulling out of there. Small white. Looks like a Toyota. Male black. Male white. Male black. Stand by. Location at the driveway. Vehicle southbound."

Officer Linda Brown, the only witness at trial, heard Howe's transmission, and within moments thereafter observed the defendant's car going southbound on Second Street. When the car was stopped, defendant was at the wheel. The defendant emerged from the car, staggering slightly. He smelled of alcohol, and after failing to satisfactorily perform sobriety field tests, was cited for operating the vehicle while under the influence of alcohol.

The People offered a document which was certified as a true copy of an original police department document which noted the receipt of a telephone call by time stamp at 3:41 a.m. which bore the words "Possible 459 into business now." Penal Code Section 459 deals with the elements of the offense of burglary. This document was received into evidence pursuant to section 1280 of the Evidence Code over objection.

It was also stipulated that Mr. Greenbank, the caller, phoned from the Carmel Hotel located at 201 Broadway in Santa Monica after receiving information from an unknown informant.

---

*Assigned by the Chairperson of the Judicial Council.

## DISCUSSION

■ The issue which we are called upon to determine is whether the *Harvey-Madden* rule relative to arrests applies to the detention which occurred in this case.

*People* v. *Harvey* (1958) 156 Cal.App.2d 516 [319 P.2d 689], arose out of a conviction for the possession of marijuana. Police officers, acting upon information supplied to them by another officer that the defendant was trafficking in drugs, conducted a surveillance of his activities. After watching him for a period of time, they placed him under arrest and recovered the contraband. The reviewing court found that the arrest was made solely in reliance on the information and briefing from the other officer. This was held to be an inadequate basis for an arrest, and invalidated the subsequent recovery of the narcotics.

*People* v. *Madden* (1970) 2 Cal.3d 1017 [88 Cal.Rptr. 171, 471 P.2d 971], dealt with similar facts. A police officer received information from two other officers that the defendant was engaged in the sale of narcotics. The arresting officer went to defendant's home, had a discussion with the defendant at the threshold, entered the home and conducted the search. The trial court ruled that the defendant had not consented to the search, but that the officer had probable cause to enter the premises and conduct his search. The Supreme Court reversed, stating at page 1021, ". . . [A]lthough an officer may make an arrest based on information received through 'official channels,' the prosecution is required to show that the officer who originally furnished the information had probable cause to believe that the suspect committed a felony. We reaffirmed this principle in the recent case of *Remers* v. *Superior Court* [1970] 2 Cal.3d pp. 659, 666-667 [87 Cal.Rptr. 202, 470 P.2d 11], where we pointed out: 'It is well settled that while it may be perfectly reasonable for officers in the field to make arrests on the basis of information furnished to them by other officers, "when it comes to justifying the total police activity in a court, the People must prove that the source of the information is something other than the imagination of an officer who does not become a witness." ' "

The distinction between the facts in these two cases and those in the case at hand is immediately apparent. In *Harvey* and *Madden,* the information given to the arresting officer was relayed to him hours or days in advance. Here, the information was forwarded in the nature of an emergency communication, a mere minute or two before the actual stop. Further, we are dealing with a detention which gave rise to an opportunity to observe, without a search. The appearance of defendant resulted in an arrest for

driving under the influence. This is in fact a case in which the stop, detention and subsequent arrest are supported by probable cause.

■ The more recent decision of *In re Tony C.* (1978) 21 Cal.3d 888 [148 Cal.Rptr. 366, 582 P.2d 957], after noting at page 892 that, "It is settled that circumstances short of probable cause to make an arrest may justify a police officer stopping and briefly detaining a person for questioning or other limited investigation," continued, "The guiding principle, as in all issues arising under the Fourth Amendment and under the California Constitution [citations], is 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' [Citation.] Because of the limited scope of that invasion in the present context, it need not be supported by the actual belief in guilt required to arrest, book, and jail an individual on a named criminal charge."

The critical language appears at page 893: "Balancing these factors, the courts have concluded that in order to justify an investigative stop or detention the circumstances known or apparent to the officer must include specific and articulable facts causing him to suspect that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person he intends to stop or detain is involved in that activity. Not only must he subjectively entertain such a suspicion, but it must be objectively reasonable for him to do so: the facts must be such as would cause any reasonable police officer in a like position, drawing when appropriate on his training and experience [citation], to suspect the same criminal activity and the same involvement by the person in question."

■ Let us look to the evidence that we have before us. The arresting officer, Linda Brown, was aware of a police broadcast of "a possible burglary in progress" at an address on Second Street in Santa Monica. Within moments of this broadcast a second call was received, this time from Officer Howe that a vehicle was pulling out from this location, "A vehicle pulling out of there. Small vehicle. Looks like a Toyota. Male black. Male white. Male black. Stand by. Location at the driveway. Vehicle southbound." Applying the twin tests of *Tony C.,* Officer Brown was justified in stopping defendant's automobile: there was immediacy in the time frame; the color of the small car corresponded to the color of the observed car; the car was a compact (although it was a Mazda and not a Toyota); the vehicle contained several individuals and, finally, was proceeding in a direction away from the location of the business in question.

Officer Brown was entitled to detain the defendant for further investigation. The observations which came thereafter such as the defendant's

staggering gait and alcoholic breath supplied an ample basis for the tests which resulted in a citation for driving while under the influence of alcohol.

Appellant has cited *Ojeda* v. *Superior Court* (1970) 12 Cal.App.3d 909 [91 Cal.Rptr. 145], as supporting his position that Officer Brown's stop and observations were inappropriate. In *Ojeda,* a highway patrol officer received a radio communication to be on the lookout for a station wagon of a description similar to that which was ultimately stopped. The occupants of the car had purportedly participated in a robbery (a statement which was in error). The defendant was stopped, arrested and later searched on the basis of this information. The appellate court found this procedure to be improper as information which was offered as probable cause for the broadcast and subsequent arrest was without proof of the nature and origin of the report and therefore insufficient to supply probable cause for the officer's conduct. Further, the evidence which was offered to the trial court came as the result of a *search after arrest,* and not as the result of mere observation on the part of the citing officer. At page 918, the court notes, 'If someone cries out, 'Stop thief' an officer is not required to investigate to determine whether the cry in fact came from the victim or a perceptive witness, . . . before stopping the apparent fleeing perpetrator."

*Restani* v. *Superior Court* (1970) 13 Cal.App.3d 189 [91 Cal.Rptr. 429] is a case in which a certain vehicle was suspected of involvement in a homicide. The arresting officer received a radio call that there was an all points bulletin regarding a murder suspect in a white-over-maroon Volkswagen bus. The officer observed defendant in a similar vehicle, and approached him after he had parked. When the officer told him that he was investigating a homicide, the defendant threw open the doors of the bus, and the officer observed what he identified as an amphetamine tablet. At no time did the officer request to search the van. The court held that the failure of the People to sustain its burden of probable cause for detention by failing to present as a witness the officer who initiated the original broadcast or the officer who had the conversation with a citizen witness did not vitiate the defendant's arrest unless the arrest was an exploitation of such illegal detention. At pages 197-198, "Biddle's observation of the amphetamine tablet in the shaving kit was not 'tainted' merely because petitioner might not have opened the kit *but for* the officer's demand to see his identification. . . . Accordingly, if the prosecution can establish that the primary illegality was not a *sine qua non* or indispensable cause of the discovery of the physical evidence, but, that at worst it merely contributed to such discovery, the exclusionary rule does not apply." This decision fails to offer comfort to defendant in the present case as his predicament arises from a stop, detention, and nonsearching observation.

The prosecution has relied upon the exhibit which was offered as a record of the Santa Monica Police Department. This document was time stamped and headed "CALL FOR SERVICE RECORD." It is certified as a true and correct copy of an original document by Sergeant Keane of that department. It shows on its face that "second hand info poss 459 to business." The location is the "Bay City Van and Storage 1524 Second." The time stamp shows "'86 FEB 4 3:41."

Conceding the hearsay nature of the contents of the exhibit, there is a stipulation in the record that a call was initiated to the department by a Mr. Greenbank, and this is a record which memorializes receipt of such a call in the Santa Monica Police Department. With this corroboration supporting the police radio transmissions, there is sufficient evidence to justify the stop of defendant's vehicle for further investigation. In any event it puts to rest the contention that the stop was predicated upon information which may have been fabricated by a police agency.

Let us then turn to federal decisions to determine whether a different result is mandated.

The case which first considered the problem of an arrest or detention based upon a communication from one police officer to another is *Whiteley* v. *Warden* (1971) 401 U.S. 560 [28 L.Ed.2d 306, 91 S.Ct. 1031]. The factually complicated situation developed in this fashion: a Wyoming police officer received a radio alert issued by the sheriff of another county which caused him to stop the defendant's car and arrest the occupants. The radio bulletin was based upon an arrest warrant which a justice of the peace had issued predicated upon information which the sheriff had supplied. A search of the car disclosed the presence of old coins and tools which comprised the loot obtained from the burglarized premises. The court held that the sheriff responsible for the issuance of the warrant had failed to supply sufficient facts to the court to constitute probable cause, and that the later arrest and search suffered from the same defect.

However, *Whiteley* bears only a faint resemblance to the situation that we must deal with here. The information which the reporting sheriff obtained was based upon interviews and investigation conducted the day following the break-in. The officers arresting defendant recovered the loot after a search of the trunk of the defendant's car, which was made after the arrest. These conditions did not exist as operative facts in the present case.

Here, the stop of defendant's vehicle was made under the belief that defendant was participating in an ongoing crime, namely, burglary; the stop was made for the purpose of further investigation and the basis of the

prosecution did not result from a search after arrest, but from the observation of defendant's intoxicated condition; there was never a search of defendant or the vehicle as a result of the information broadcast by radio.

None of the decisions cited to this court has demonstrated a basis upon which the stop of defendant's car is prohibited.

The leading federal decision on the subject, *United States* v. *Hensley* (1985) 469 U.S. 221 [83 L.Ed.2d 604, 105 S.Ct. 675], does not compel a different conclusion. In this case, officers in Cincinnati issued a "wanted flyer" to other police departments stating that the defendant was wanted for investigation of robbery. Two weeks later, officers of another department stopped a car that the defendant was driving and observed a handgun protruding from under the passenger seat. It was recovered, and defendant was prosecuted for a federal firearms violation.

The court found a distinction between two types of police stops: the first, dealing with one made on the basis of the person stopped being involved in an ongoing crime; the second dealing with a stop made to investigate a completed offense. While the decision in *Hensley* deals with the latter situation, the case at hand involves the former. The lapse of two weeks time between the commission of the crime in the *Hensley* stop allows investigators an opportunity to marshal the available evidence which establishes probable cause. This can hardly be expected of an officer who is acting under the belief, albeit erroneously, that she is preventing the escape of a felon fleeing from the scene of the crime.

At pages 228-229 [83 L.Ed.2d at page 612] the court notes, "A stop to investigate an already completed crime does not necessarily promote the interest of crime prevention as directly as a stop to investigate suspected ongoing criminal activity. Similarly, the exigent circumstances which require a police officer to step in before a crime is committed or completed are not necessarily as pressing long afterwards. Public safety may be less threatened by a suspect in a past crime who now appears to be going about his lawful business than it is by a suspect who is currently in the process of violating the law. Finally, officers making a stop to investigate past crimes may have a wider range of opportunity to choose the time and circumstances of the stop."

Now to consider those questions which turn on whether the admissible evidence justifies the conduct of Officer Brown who stopped and ultimately cited appellant.

The first issue is whether the failure of the prosecution to call either the Santa Monica police dispatcher or Officer Howe to testify to observa-

tions and conduct leaves the record in such state that the stop and detention of defendant cannot be legally justified. The trier of fact heard, and the record discloses that a call was received from an identified informant who advised the department of the location of a possible crime in the process of commission. This is supported by certified documents of the police department that the call from the informant was received by the department at 3:41 a.m. on the date in question. It is clear that the radio call regarding a burglary in progress at the address was placed on the air as it was received by Officer Brown who responded to it. The next radio transmission from Officer Howe was also received by Officer Brown who stopped the car which generally conformed to the description given by Officer Howe and which contained the appellant and others. While it can be justifiably claimed that this evidence is factually weak, it cannot be said that this evidence in toto is insufficient to support the stop of defendant's vehicle.

If it is argued that Officer Brown's testimony relative to the amount of information which came over the air is inaccurate in part does not change the result: the record is clear as to what was accurate, namely, a small white car resembling a Toyota with four men in it was leaving the "crime scene" and proceeding south. This is factual information, and it is part of the testimony before the trial court. It is also part of the record that Officer Brown heard it.

■ The contention that Officer Howe's broadcast constituted inadmissible hearsay also must fail. Whether the statements of Officer Howe are offered to prove the truth of the matter asserted need not be considered. Even if we concede that the statement is a hearsay declaration, it qualifies for admission as a hearsay exception as a spontaneous statement,[1] or a contemporaneous statement.[2] Certainly the statement *explains the act* of broadcasting under section 1240, and *makes understandable the conduct* of the declarant under section 1241.

■ But there is a much more compelling reason why this testimony is properly considered by the trial court: The parties stipulated to the admissi-

---

[1] California Evidence Code section 1240:
"Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and
"(b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." (See also *People* v. *Cooper* (1967) 249 Cal.App.2d 479 [57 Cal.Rptr. 588].)

[2] California Evidence Code section 1241:
"Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Is offered to explain, qualify, or make understandable conduct of the declarant; and
"(b) Was made while the declarant was engaged in such conduct."

bility of the original call of the informant and to the content of Officer Howe's broadcast. How can a party later complain about the admissibility of evidence which he agrees should be considered?

Do the *Harvey-Madden* and *Whiteley* rules require that the officer (Howe) who made the broadcast which caused the stop of the automobile be produced in court? We think not.

Although the better practice may be to produce in court the officer who made the call, it is not the only method of justifying a stop. Admissible evidence which establishes probable cause to stop can accomplish this. As stated in *People* v. *Orozco* (1981) 114 Cal.App.3d 435 at page 444 [170 Cal.Rptr. 604], "The best way of negating 'do it yourself probable cause' is to have the officer who received the information from outside the police department testify, but that is not the only way." Here, any claim that the report is the result of prosecutorial imagination is countered by the existence of the police department record which shows the receipt of the burglary report moments before the observation by Officer Howe and subsequent broadcast.

The important consideration here is not whether a burglary was in fact being committed, but whether a radio call went out which justified the stop of appellant. The radioed statement of Officer Howe is before the court, and, being part of the trial record adequately supports the stop of the car whether Officer Howe is called as a witness or not. Returning to the point earlier made, how can it be proper to ignore or disregard testimony which was before the court by way of stipulation?

We find that there is adequate probable cause to support the investigatory stop in this case. However, were it deemed to be inadequate, the circumstances surrounding the stop are such that the arresting officer, with the limited information available to her was justified under *Tony C.* in taking the investigatory steps which followed. Her observations of the defendant's intoxicated condition are then admissible as evidence against him at the time of trial.

DISPOSITION

The judgment is affirmed.

Lillie, P. J., concurred.

JOHNSON, J.—I respectfully dissent. I regard this case to raise an issue of vital importance to the average citizen. In effect, the majority tells law

enforcement officers in this state they are free to detain any citizen at any time another officer *claims* to have "reasonable suspicion" the citizen is involved in an ongoing crime without having to be concerned that this other officer will be required to prove in court he actually possessed that "reasonable suspicion." In so holding, the majority runs counter to a recent unanimous holding of the United States Supreme Court—to say nothing of earlier decisions of the California Supreme Court and other Courts of Appeal.

To understand why I do not consider I am being overly harsh in my judgment of the majority opinion, it is necessary to expand on their discussion of the law.

The appellate department properly found the observation of appellant's intoxication which led to his arrest and conviction on that charge was the "fruit" of his detention for investigation of burglary. (See, e.g., *Wong Sun* v. *United States* (1963) 371 U.S. 471, 485 [9 L.Ed.2d 441, 454, 83 S.Ct. 407] ["testimony as to matters observed during an unlawful invasion [is] excluded"]; *Davis* v. *Mississippi* (1961) 394 U.S. 721, 724 [22 L.Ed.2d 676, 679, 89 S.Ct. 1394] [anything (including in that case a fingerprint) sharing "'the decisive common characteristic of being something of evidentiary value which the public authorities have caused an arrested person to yield to them during illegal detention'" is inadmissible].) In the instant case, during the detention prompted by the burglary investigation the officers observed appellant's breath and gait and caused him to undergo a field sobriety test which evidence was used against him in the drunk driving prosecution. Accordingly, the appellate department properly concluded, the validity of the drunk driving conviction depends on the validity of the detention. In order to uphold the detention, however, the court had to deal with the failure of the prosecution to produce the officers who claimed to possess the reasonable suspicion which purportedly supported the order to detain appellant's vehicle. In a 2-1 opinion, the appellate department ruled it was unnecessary to produce those officers because this was a detention not an arrest and upheld the drunk driving conviction.

The appellate department certified a single question to this court and deserves an answer to that question. The question is: Does the *Harvey-Madden* rule apply to detentions as well as arrests? To my mind, the answer to that question is and should be "Yes" under California law. But that actually has become irrelevant. Recent controlling decisions from the United States Supreme Court have taken that question away from the California courts by announcing unequivocally that the United States Constitution compels an affirmative answer. Nonetheless, as neccessary background I start with California's *Harvey-Madden* rule, our state's version of what is known more generically as the "fellow officer" rule.

## I. *The Harvey-Madden Rule Continues to Apply to Detentions as Well as Arrests Under California Law*

The requirement the People prove the officers who initiated an arrest (or detention) request possessed enough evidence to justify the arrest (or detention) when that arrest (or detention) is actually made by other officers is often called the *"Harvey-Madden* rule." The opinions which first announced this rule happened to involve full scale arrests where a full measure of "probable cause" was required to justify the officers' action. (*People* v. *Madden* (1970) 2 Cal.3d 1017 [88 Cal.Rptr. 171, 471 P.2d 971]; *People* v. *Harvey* (1958) 156 Cal.App.2d 516 [319 P.2d 689].) The People argue—and the appellate department majority opinion appeared to rule—that this *Harvey-Madden* rule does not apply where the officers only detain rather than arrest the suspect. With this position I strongly disagree. Precedent and policy both argue against it.

In ruling as it did the appellate department majority actually ignored two contrary precedents which were binding on it and did so despite a dissent which pointed out the existence of this authority. These previous Court of Appeal opinions addressed the precise issue whether the *Harvey-Madden* rule applies to detentions as well as arrests. In *Restani* v. *Superior Court* (1970) 13 Cal.App.3d 189 [91 Cal.Rptr. 429], a dispatcher in Ukiah broadcast a bulletin to stop and investigate a maroon Volkswagen bus that an unnamed "citizen" had told a Red Bluff officer was seen near a murder scene. A California Highway Patrol (CHP) officer received the bulletin, followed a vehicle matching the description, and waited for it to stop. He then approached the Volkswagen and began talking with the driver about the fact his vehicle fit the description of one suspected to be involved in a Bay Area murder. Without any hint the patrolman wanted to search the van, the driver said he hadn't done anything, threw open all the doors and conducted a tour of the interior for the officer's benefit. During that tour the officer spotted what he suspected to be a single amphetamine pill. He arrested the driver and searched the vehicle thoroughly, uncovering marijuana and LSD, as well as more amphetamines.

At the hearing on the motion to suppress, the People did not produce the officer or officers who initiated the all-points bulletin. The appellate court ultimately upheld the search on grounds it was not a product of a detention of the vehicle but of the defendant's completely voluntary opening of the van while engaged in a completely voluntary discussion with the officer after the defendant had stopped his vehicle for his own reasons. Nevertheless, the bulk of the court's opinion is devoted to an exploration of the issue posed by the instant case—whether the detention was not proved to be valid because the People failed to show the officer or officers who initiated the

bulletin possessed evidence giving rise to a "reasonable suspicion" the vehicle and its occupant were involved in a crime. On this issue the court first discussed the general principle at considerable length: "It is . . . established that even though there are no unusual or suspicious circumstances warranting detention by the detaining officer he may, nevertheless, detain a person for investigation or questioning upon the basis of information received through 'official channels.' (Citations omitted.) However, if the detaining officer himself does not have personal knowledge of facts justifying the detention, but acts solely on the basis of information or direction given him through police channels, the prosecution must establish in court, when challenged, evidence showing that the officer who originally furnished the information had probable cause to believe that the suspect had committed a felony, or, at the very least, that such officer was in possession of facts amounting to circumstances short of probable cause which would have justified him to personally make the detention. (Citations omitted.) As succinctly stated in *People* v. *Hunt* [*supra,* 250 Cal.App.2d 311] at page 314: 'An order by one officer to another insulates the complying officer from assuming personal responsibility for the acts done in obedience to the order, but the order does not itself supply legal cause for the detention any more than the fact of detention supplies its own cause. . . . The fact that an officer does not have to have personal knowledge of the evidence supplying good cause for a detention before he can obey a direction to detain a suspect does not mean that evidence of good cause for the detention need not be established at the trial to legitimate the detention and its products.' As applied to this case, if the officer who initiated the broadcast has adequate cause to detain petitioner, he could properly delegate the detention to [the CHP officer who detained the suspect], but if he did not have cause to detain, he could not create such cause by simply relaying an order to a fellow officer to detain petitioner." (13 Cal.App.3d at pp. 195-196.)

Having announced the general principle, the *Restani* court then turned to the facts of the particular case. "According to the testimony presented at the hearing below, the all-points bulletin received by [the detaining patrolman] originated from a conversation another officer had with an unidentified 'citizen' in Red Bluff. The officer who had this conversation was *not in court to testify under oath*. It *therefore cannot be determined* whether he had reasonable cause to either detain petitioner or order his detention. . . . Under such circumstances, while [the detaining patrolman] acted properly in detaining petitioner for investigation in reliance on the radio broadcast, the prosecution did not, when it came to justifying the *total police activity* [italics in original] in court, sustain its burden of establishing probable cause *for the detention.*" (13 Cal.App.3d at pp. 196-197, italics added.)

This language in the *Restani* opinion is unmistakably clear. It unequivocally holds the People must *produce the witnesses and prove* at the suppres-

sion hearing that the officers initiating a request for an investigatory detention possessed sufficient evidence of wrongdoing—what generally is termed "reasonable suspicion"—to justify the detention.

Since the *Restani* court ultimately upheld the search on other grounds after ruling the detention illegal, some might be tempted to discount the *Restani* holding on the detention issue as some specie of dictum. However, these sceptics need only to turn to *Ojeda* v. *Superior Court* (1970) 12 Cal.App.3d 909 [91 Cal.Rptr. 145], decided less than a month before *Restani* and by the very same panel.

In *Ojeda* another CHP officer stopped an automobile fitting a description broadcast by a dispatcher as being a vehicle involved in a robbery. During a "pat-down" of the driver the officer discovered a large amount of change. Other officers arrived shortly and searched the suspect further. They discovered narcotics paraphernalia. The driver ultimately was prosecuted on narcotics charges.

At the suppression hearing, the People once again failed to produce evidence the officers initiating the broadcast had "reasonable cause" to detain the suspect's vehicle. After considering the People's argument the broadcast was entitled at least to the same status as an anonymous complaint, the Court of Appeal ruled: "Despite the foregoing considerations, it is concluded that in the face of defendant's persistent objections it was erroneous to uphold the validity of the arrest without *proof* of the *nature and origin of the report* which, when transmitted, resulted in the *detention,* arrest and search of the defendant. It is not unfair, even if not constitutionally required,[1] to insist that the People, who are in the best position to do so, come forward with the evidence on that issue, once it is properly raised by the defendant." (12 Cal.App.3d at p. 920, italics added.)

Based on this holding, the *Ojeda* court issued a peremptory writ of mandate directing the superior court to grant the motion to suppress. (12 Cal.App.3d at p. 921.) The *Restani* opinion contains the more thorough discussion of why the *Harvey-Madden* rule applies to detentions as well as arrests. The *Ojeda* decision conclusively establishes the failure to abide by that rule in a detention setting supplies sufficient grounds to suppress any evidence which is the product of the unsubstantiated detention.

In view of the existence of these clear and binding precedents from a higher court, the appellate department was not only wrong it may have

---

[1] The United States Supreme Court in a case decided a year after *Ojeda* erased any doubts this was a constitutional requirement not merely a matter of "fairness." See *Whiteley* v. *Warden* (1971) 401 U.S. 560 [28 L.Ed.2d 306, 91 S.Ct. 1031] discussed at pages 64-68, *infra.*

been without jurisdiction to rule as it did in the instant case on the issue of whether *Harvey-Madden* applies to detentions as well as arrests (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937]).

II. *Irrespective of California Law, Federal Decisions Require Proof the Officer or Officers Initiating a Detention Request Possessed "Reasonable Suspicion" the Detainee Was Involved in Criminal Activity*

This court, unlike the appellate department, is not bound by *Restani* and *Ojeda* (*Auto Equity Sales, Inc.* v. *Superior Court, supra,* 57 Cal.3d at p. 455). Accordingly, were these opinions the only authority on the issue we would be free—in theory if not in sound reason—to reach the same result as the appellate department majority and hold the *Harvey-Madden* rule does not apply to detentions. However, that option has been foreclosed even in theory by what the United States Supreme Court has decided the United States Constitution requires of local law enforcement officers and of the prosecutors who seek to justify their arrests *and detentions* in court.

In 1971, the year after the California Supreme Court's *Madden* decision, the United States Supreme Court announced a rule essentially identical to California's *Harvey-Madden* rule. It is called the "fellow officer rule" (and occasionally the "*Whiteley* rule"). In the leading case (*Whiteley* v. *Warden, supra,* 401 U.S. 560) a Laramie, Wyoming, officer stopped a car and arrested the occupants based on a radio bulletin issued by the sheriff of another county. The radio bulletin, in turn, was based on an arrest warrant which a justice of the peace had granted on a conclusionary complaint the sheriff supplied. The nation's highest court first found the sheriff lacked enough probable cause to arrest without a warrant since his conclusionary complaint was based solely on an unnamed informant. It next ruled the fact the Wyoming police found the described individuals in the described automobile did not furnish corroboration "that would support either the reliability of the informant or the informant's conclusion that these men were connected with the crime." (*Id.* at p. 567 [28 L.Ed.2d at p. 313].) The Supreme Court then considered the issue whether the Laramie police nevertheless were entitled to rely on the radio bulletin in stopping the described vehicle and arresting the described suspects.

"We do not, of course, question that the Laramie police were entitled to act on the strength of the radio bulletin. Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause. Where, how-

ever, the contrary turns out to be true, an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest.

". . . The arresting officer was not himself possessed of any factual data tending to corroborate the informer's tip that Daley and Whiteley committed the crime. Therefore, petitioner's arrest violated his constitutional rights under the Fourth and Fourteenth Amendments; the evidence secured as an incident thereto should have been excluded from his trial." (401 U.S. at pp. 568, 569 [28 L.Ed.2d at p. 313].)

A leading commentator has construed this passage in *Whiteley* to mean the arresting officer is immune from a civil lawsuit if he acts in response to an official bulletin even if that bulletin was issued without probable cause to arrest. But if "the question arises in an exclusionary rule context rather than in an action against the arresting officer, if it turns out that there is no warrant . . ., then it must be shown that there were grounds for a warrantless arrest in the hands of the arresting officer or of the agency or officer which prompted him to make the arrest." (2 LaFave, Search and Seizure (2d ed. 1987) p. 7.)

In 1985, the Supreme Court specifically addressed the very question raised in this appeal—whether the same principle applies in the context of detentions as well as arrests. In *United States* v. *Hensley* (1985) 469 U.S. 221 [83 L.Ed.2d 604, 105 S.Ct. 675], the court upheld a detention in Covington, Kentucky, of a vehicle carrying a suspect who was the subject of a "wanted flyer" issued by St. Bernard, Ohio, police. But in upholding the detention the nation's highest court made it clear the "fellow officer" rule applies to detentions not just arrests. Writing for a unanimous court, Justice Sandra Day O'Conner ruled: "We conclude that, *if a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion* that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification, [citation omitted]. . . . *If the flyer has been issued in the absence of a reasonable suspicion, then a stop in the objective reliance upon it violates the Fourth Amendment.* . . . It is the objective reading of the flyer or bulletin that determines whether other police officers can defensibly act in reliance on it. [Citation omitted.] Assuming the police make a *Terry* stop in objective reliance on a flyer or bulletin, we hold that the evidence uncovered in the course of the stop is admissible *if the police who issued* [italics in original] *the flyer or bulletin possessed a reasonable suspicion justifying a stop,* [citation omitted], and if the stop that in fact occurred was not significantly more intrusive than

would have been permitted the issuing department." (469 U.S. at pp. 232-233 [83 L.Ed.2d at pp. 614-615], italics added.)

The *Hensley* opinion emphasizes the St. Bernard, Ohio, policeman was produced at the suppression hearing. He personally testified at length about an informant who had participated peripherally in the crime and who was able to describe a "wealth of detail" about that crime. On the basis of this testimony the Supreme Court held: "We agree with the District Court that the St. Bernard police possessed a reasonable suspicion, based on specific and articulable facts, that Hensley was involved in an armed robbery. . . . [*The St. Bernard officer's testimony*] *established that the informant was sufficiently reliable and credible 'to arouse a reasonable suspicion of criminal activity* by [the suspect] and to constitute the specific and articulable facts needed to underly a stop.'" (Italics added.) (469 U.S. at pp. 233-234 [83 L.Ed.2d at p. 615].)

The clear implication of the quoted language from the *Hensley* opinion is that had the prosecution failed to produce testimony at the suppression hearing from the Ohio officer who interviewed the informant and thereby acquired the requisite "reasonable suspicion" it would not have met its burden and the evidence resulting from the detention would have been suppressed. Without that testimony the prosecution would not have proved the "officers issuing the bulletin or flyer possessed a reasonable suspicion justifying a stop." As a consequence, "the stop in the objective reliance upon [the bulletin or flyer] violates the Fourth Amendment."

The *Hensley* opinion was predicted by a leading commentator on the law of search and seizure as the only logical reading of the earlier *Whiteley* decision: "*Whiteley* teaches that probable cause for arrest is not conclusively established by a police communication asking that the arrest be made, for otherwise such a communication would allow the police to make seizures without the grounds required under the Fourth Amendment. This being so, it must follow that such a communication, whether it seeks an arrest *or a stopping for investigation,* does not conclusively establish the degree of reasonable suspicion required to justify a brief on-the-street detention for purposes of investigation." (2 LaFave, *supra,* § 3.5(b), p. 14, italics added.)[2]

---

[2] One pre-*Hensley* federal case supported the People's position in this case. In *United States v. Hernandez* (1973) 486 F.2d 614, the Seventh Circuit Court of Appeals upheld a detention based on a police broadcast without requiring proof the initiating officer possessed "reasonable cause." "Although the radio bulletin was not sufficient to support an arrest, it was sufficient to support an investigatory stop." (486 F.2d at p. 617.)

Even before the Supreme Court announced *Hensley,* the *Hernandez* opinion was sharply criticized by other federal courts which refused to follow it. (*United States v. Mobley* (4th Cir. 1983) 699 F.2d 172 [detention on orders of superior valid only if proved superior had "reasonable suspicion"]; *United States v. Robinson* (9th Cir. 1976) 536 F.2d 1298 [detention pur-

The Supreme Court did not find it necessary to elaborate in *Hensley* on its rationale for applying the "fellow officer rule" to detentions as well as arrests.[3] But it is easy to foresee absurd results flowing from adoption of the position the People urge, the ruling the appellate department made in the instant case, as well as the stance adopted by the majority opinion in this court. "[W]hen a police bulletin is accepted at face value when it is utilized only for purposes of making a stop, then there is no determination at all of reliability. Such acceptance is not only wrong, it could lead to ludicrous results; an officer could not make a stop on the basis of assertions from an

---

suant to radio broadcast valid only if proved dispatcher had sufficient probable cause]. See also *People* v. *Hazelhurst* (Colo. 1983) 662 P.2d 1081; *People* v. *Brown* (1980) 88 Ill.App.3d 514 [410 N.E.2d 505]; *State* v. *Benson* (1977) 198 Neb. 14 [251 N.W.2d 659]; *State* v. *Hill* (1981) 3 Ohio App.3d 10 [443 N.E.2d 198]; *Martin* v. *State* (Okla.Crim.App. 1980) 620 P.2d 446.)

The *Hernandez* position was untenable even before the Supreme Court filed *United States* v. *Hensley, supra.* As the Ninth Circuit pointed out in *United States* v. *Robinson, supra,* 536 F.2d 1298, a decision the Supreme Court cited with approval in *Hensley*: "*Whiteley* involved probable cause, rather than founded suspicion, but we perceive no substantive difference between the two doctrines that would warrant a different result." (*Id.* at p. 1300.)

[3] The United States Supreme Court has not explicitly decided that the prosecution bears the burden to call the witnesses and produce the evidence proving the officer initiating a broadcast actually possessed probable cause to arrest or reasonable suspicion to detain. However, this is because the court has not been called upon to do so. In the cases it has decided on the broader question of the "fellow officer" rule the prosecution in fact had produced the testimony of the initiating officers. This is consistent with the general procedural rule the Supreme Court has set down imposing the burden on the prosecution to establish probable cause and the other elements of legitimacy of a warrantless arrest or search once the defendant has raised the issue. (*Coolidge* v. *New Hampshire* (1971) 403 U.S. 443 [29 L.Ed.2d 564, 91 S.Ct. 2022]; *Vale* v. *Louisiana* (1970) 399 U.S. 30 [26 L.Ed.2d 409, 90 S.Ct. 1969]; *Beck* v. *Ohio* (1964) 379 U.S. 89 [13 L.Ed.2d 142, 85 S.Ct. 223]; 4 LaFave, *supra*, § 11.2(b), p. 224.)

A recent circuit court opinion (*United States* v. *Longmire* (7th Cir. 1985) 761 F.2d 411) rehearsed this well established procedural rule and applied it in a case similar to the instant one. There as here the defendant had challenged a detention and subsequent search on grounds the officer initiating the detention request lacked probable cause. "The general federal rule on who bears the burden of proof with respect to an allegedly illegal search or seizure is based upon the warrant-no warrant dichotomy: If the search or seizure was effected pursuant to a warrant, the defendant bears the burden of proving its illegality; if the police acted without a warrant, the prosecution bears the burden of establishing legality. . . . [B]ecause the evidence allegedly constituting probable cause is solely within the knowledge and control of the arresting officers, they should bear the additional burden of establishing that probable cause in fact existed. See *Beck* v. *Ohio,* 379 U.S. 89, . . . (1964) . . . .

". . . Like a warrantless arrest, a *Terry* stop has not been judicially sanctioned; there can be no presumption of legality. . . . The facts allegedly constituting the reasonable suspicion are peculiarly within the knowledge and control of the police. To require the defendant to prove the absence of a reasonable suspicion without knowledge of the facts upon which the police based their assessment of the existence of a reasonable suspicion is to place upon him an impossible burden. . . . Because the scope and duration of a seizure must be commensurate with the level of objective justification for it, we believe the prosecution also must bear the burden of establishing there was a reasonable suspicion of criminal activity justifying the seizure. We hold that the government bore the burden of establishing by a preponderance of the evidence [citation omitted], that [the initiating officer] had a reasonable suspicion justifying the seizure of [appellant] and her companion." (761 F.2d at pp. 417-418.)

anonymous informant made to him, but could bring about a lawful stop by the simple expedient of passing those assertions on to another officer. Nor can it be said that reliability may be assumed because the police would not disperse a bulletin on a suspect unless they had at least the quantum of evidence needed to make a stop. This approach is inconsistent with the philosophy of *Whiteley,* and is also contrary to fact [citing to case involving stop based on anonymous tip conveyed through official police broadcast]." (3 LaFave, *supra,* § 9.3(f), p. 488.)

For all these more than sufficient reasons, I conclude the rule commonly called the *Harvey-Madden* rule in California law and the "fellow officer" rule in federal jurisprudence continues to apply to the establishment of "reasonable suspicion" for detentions as well as the establishment of "probable cause" for arrests.

III. *Insufficient Admissible Evidence Was Presented at the Hearing to Support the Conclusion the Officers Responsible for the Directive to Detain Appellant's Vehicle Actually Possessed "Reasonable Suspicion"*

Had the trial court had before it admissible evidence proving all elements of the story the People would have us believe, I would have no difficulty concluding the officers had sufficient evidence of possible wrongdoing to justify a detention of this vehicle and its occupants for investigation of a possible burglary. But it is a far different question whether on the basis of the admissible evidence actually before the trial court it could make the neccessary finding. The prosecution did not call the dispatcher who allegedly received the anonymous tip and broadcast it to the officers. Nor did the prosecution call Officer Howe who arrived at the scene of the alleged burglary and broadcast the order to detain appellant's vehicle. Instead the prosecution elected to rely on the testimony of Officer Greene, who heard both these broadcasts and in response detained appellant's car, as its sole law enforcement witness.

I do not have to reach the question whether the existence of the anonymous tip about a burglary in progress was adequately proved in the absence of testimony from the tipster or the dispatcher, although I have serious doubts it was established.[4] But even assuming the existence of the tip was

---

[4] Purportedly, an anonymous tipster told a Mr. Greenbanks that a burglary was underway at the storage facility and Mr. Greenbanks relayed this tip over the telephone to the Santa Monica police dispatcher. However, the prosecution chose not to produce Mr. Greenbanks or the tipster or the dispatcher or any other officer who purportedly received the telephone call from Mr. Greenbanks. The prosecution tried to satisfy the *Harvey-Madden* and *Whiteley-Hensley* rule by introducing a slip of paper labelled "Call For Service Record" at the continued hearing. The prosecution contends this "Call for Service Record" is an admissible public record proving the report was received. This form was certified as coming from the Santa Monica Police Department files and does have bits of information scratched into vari-

verified, I find Officer Howe's testimony absolutely crucial to a showing of "reasonable suspicion" to detain appellant's vehicle. Thus the failure to call this "fellow officer" witness was fatal in and of itself.

Officer Howe allegedly could have testified she observed appellant and his friends move boxes around at the Bay Cities Storage Company and then depart in the small white automobile. Had the People called this officer and she testified to seeing what Officer Brown claimed Officer Howe broadcast she saw, it probably would have supplied enough corroboration of the anonymous tip to justify the order to detain for investigation. Even though Officer Howe did not see anyone actually removing boxes from the location what she allegedly did observe would have been enough to confirm the telephone report from the anonymous source that something suspicious was happening at the storage company. Appellant and his colleagues could already have completed a theft from the storage facility and been merely rearranging the boxes to postpone discovery of the theft.

This is but idle speculation, however, since the People did not call Officer Howe. True, Officer Brown did testify she heard Officer Howe broadcast a report over her car radio that the suspects were either stealing or moving boxes around and then were leaving in a small white auto. However, there are two problems with Officer Brown's testimony about what Officer Howe broadcast.

First, Brown's testimony is refuted by direct evidence of what Officer Howe actually broadcast from the area of the storage company. At the

---

ous boxes. But there was no testimony under oath either linking this anonymous form to the instant case or explaining the meaning of the entries. Accordingly, assuming the admissibility of this slip of paper as a public record, I seriously question whether it can stand naked of explanatory testimony as a substitute for the testimony of the dispatcher or other officer who may have received the purported report of the anonymous tip from Mr. Greenbanks.

Still more fundamentally, even if we accept this "Call for Service Record" as related to the alleged tip from the anonymous informant it does not represent *sufficient* evidence to *prove* the call was received and was the basis of the broadcast the dispatcher made. The majority seems to equate admissibility with sufficiency. Yet a piece of evidence can be admissible on a certain issue of fact without being sufficient to prove that fact (*Carlton* v. *Department of Motor Vehicles* (1988) 203 Cal.App.3d 1428 [250 Cal.Rptr. 809]).

Evidence an officer recorded a purported report from an informant at the same time he told other officers he had this information adds nothing to the credibility of the claim he actually received such a report. If an officer wants to "manufacture" probable cause by passing along untrue information or observations to other officers it only takes a little extra effort to write that same "manufactured" information contemporaneously in a police report or other record. It is not possible to cross-examine a slip of paper. If the *Harvey-Madden* and *Whiteley-Hensley* rule could be satisfied by introducing an officer's written report in lieu of the officer himself, the rule would be virtually meaningless. Only because I find the existence of the anonymous tip irrelevant to the outcome of this case do I refrain from dissenting outright on the majority's resolution of this evidentiary issue as well.

direction of the court, the prosecutor and defense counsel listened to the tape of the broadcast Howe made and stipulated to its content. The stipulation reports no mention of any observations on the scene. Instead the brief broadcast only contained a bare order describing the vehicle to be detained and the direction in which it was proceeding. This stipulation coupled with the failure of the People to offer the testimony of the officer whose broadcast is in dispute casts real doubts on the accuracy of Officer Brown's testimony on this point. Indeed if there ever was reason to second guess a trial court's apparent—or at least implied—credibility decision, this is it. One has to put blinders over one's eyes to accept Officer Brown's recollection of Officer Howe's broadcast in the face of a stipulation from the two attorneys who listened to the broadcast that it contained no reference to Officer Howe's observation of suspicious activity at the site. (This does not mean Officer Howe did not in fact observe what Officer Brown described in her testimony. But one suspects those observations were recorded in a police report Officer Brown reviewed for the June 1988 hearing rather than being reported over the airwaves in the early morning hours of February 4, 1986.) Accordingly, this is that rare case where the Court of Appeal would be justified in discounting testimony the trial court credited. I need not take this extraordinary step, however, because there is a second, more fundamental, problem with Officer Brown's testimony about what Officer Howe broadcast.

Accepting the truth of Officer Brown's testimony she heard Officer Howe broadcast she had observed suspicious activity, that testimony in any event is inadmissible hearsay on the question whether Officer Howe actually saw anything. Under *Harvey-Madden* and *Whiteley-Hensley* the People must produce the officer who claimed to make the observations not just the officers who heard him broadcast the claim. This follows for the same reason the prosecution must produce the officer who claims to have received information from an informant not just the officers who heard him make that claim. The purpose of the rule is to guard against "manufactured" probable cause (or reasonable suspicion). Just as an officer might "manufacture" probable cause by broadcasting a false report he heard an informant say a described person committed a crime he could just as easily "manufacture" probable cause by broadcasting a false report he had seen the described person commit the crime or behave suspiciously. Unless the officer is brought into court and under oath subjected to cross-examination there is no way of testing whether he actually saw or heard what he reported to have seen or heard in his broadcast.

Since Officer Howe did not testify, under *Harvey-Madden* and *Whiteley-Hensley* this court must disregard any claim she broadcast that she observed

suspicious activity at the Bay Cities Storage Company. Without those alleged observations, there is no corroboration of the anonymous tip the dispatcher broadcast. And, without that corroboration, the anonymous tip does not rise to the level of "reasonable suspicion" to detain. The alleged fact the anonymous tipster conveyed his tip through someone who might qualify as a "citizen informant"—Mr. Greenbanks—does not elevate the tipster himself nor his tip to the ranks of a "citizen informant reporting a crime."

But the problem is even more basic. Since Officer Howe did not testify, *Harvey-Madden* and *Whiteley-Hensley* require us to disregard that part of her broadcast which links this specific vehicle to the possible burglary the anonymous tipster allegedly reported to the dispatcher. This is not a case where the informant himself said a described individual in a described vehicle was committing a crime. At best, the anonymous tipster in the instant case reported he had observed an undescribed individual or individuals committing a burglary at a described location. None of the evidence suggests he even mentioned a vehicle was involved to say nothing of describing appellant's particular vehicle. So the only justification Officer Brown had for detaining appellant and his vehicle as opposed to any other vehicle that might have been wandering down the street was the broadcast from Officer Howe saying this described vehicle was involved in the suspected burglary they were sent to check out. The majority makes much of the defense stipulation that Officer Howe broadcast what she broadcast—that a car of a certain description was proceeding in a certain direction. However, nothing in the record suggests the defense attorney stipulated to anything more than that these were the words Officer Howe indeed uttered. True, the attorney stipulated that the broadcast was "admissible"—admissible to prove the words were uttered. But nothing establishes the attorney stipulated the broadcast was "admissible" to prove the "truth" the words asserted. And, more importantly, nothing establishes the defense stipulated the broadcast was "admissible" to prove Officer Howe had a reasonable basis for uttering those words. So without Officer Howe's testimony at the hearing we have no proof she actually saw anything at all giving her a reasonable suspicion appellant's vehicle was connected in any way with the suspected criminal activity and thus warranted detention.[5] If *Harvey-Madden*

---

[5] In an attempt to make more of Officer Howe's broadcast than it deserves, the majority opinion argues it falls under two hearsay exceptions and therefore can be accepted for the truth of the statement not just to show the statement was made. However, the broadcast fails to qualify under either exception and even if admissible under one or the other would not be sufficient to prove the officer actually possessed the required "reasonable suspicion" to order the car detained.

The suggestion this broadcast is a "spontaneous declaration" gives little credit to the professionalism of Santa Monica police officers. The key element of this hearsay exception is that

and *Whiteley-Hensley* are ever to require suppression of evidence for failure to comply with the proof standards of the "fellow officer" rule in the State of California, this is that case.

It is a bit difficult to divine what the majority is arguing in its attempt to avoid this inevitable conclusion. One possibility is that they are contending

it was uttered while the declarant was so excited by a startling event she was incapable of deliberating or thinking about what she observed. (Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 13.1, pp. 369-378, and cases cited therein; 2 Johnson, Cal. Trial Guide (1986) § 40.39, pp. 40-155–40-162, and cases cited therein.) Is it reasonable to assume police officers in general—or Officer Howe, in particular—would suffer that level of stress merely from observing some suspects leave a warehouse in a small white car? I think not (and sincerely hope not). In any event, since the People did not tender this statement as a "spontaneous declaration" *no foundation was laid to prove Officer Howe was especially susceptible to stress or that this was an unusually startling departure she observed. Nor was there evidence independent of the officer's broadcast proving the event actually occurred.

This broadcast likewise fails as a "contemporaneous statement" which ordinarily is admissible to explain why a declarant is engaging in some transaction such as turning over a deed. (See Jefferson, Cal. Evidence Benchbook, *supra,* § 13.1, pp. 378-381, and cases cited therein; 2 Johnson, Cal. Trial Guide, *supra,* § 40.40, pp. 40-165—40-169, and cases cited therein.) Here the only conduct the broadcast "makes understandable" are the acts of observing the car depart and making the broadcast itself. According to the majority's logic, the officer broadcast the suspects were leaving in a car, therefore the broadcast is admissible to "make understandable" why she broadcast that information, that is, to show she indeed observed the "suspects" do something suspicious and thus ordered their detention. This construction of the "contemporaneous statement" exception would swallow the hearsay rule in one gulp. Any hearsay statement would be admissible to "explain" or "make understandable" why the declarant made that statement. "You can infer the statement the declarant made is true because if he hadn't seen what he said he saw he wouldn't have said it; therefore, the statement is admissible to prove the truth of its content." Unless we are prepared to repeal the hearsay rule, logic and the policy behind that rule compel rejection of the majority's attempt to use the "contemporaneous statement" hearsay exception to prove Officer Howe actually possessed "reasonable suspicion" to order detention of appellant's car.

Even assuming Officer Howe's broadcast were *admissible* as a "spontaneous statement" or a "contemporaneous statement," it would not constitute *sufficient* evidence to establish Howe actually possessed "reasonable suspicion" to detain appellant's automobile. As pointed out earlier (see p. 68, fn. 4, *ante*) admissibility does not equate with sufficiency. (*Carlton* v. *Department of Motor Vehicles, supra,* 203 Cal.App.3d 1428.) At best, the broadcast is an untested extrajudicial statement used to infer the truth of what the declarant said when the very issue in dispute is whether that declarant actually saw what she said she saw. This is "weaker and less satisfactory evidence" when clearly "it was within the power of [the People] to produce stronger and more satisfactory evidence," that is, Officer Howe herself. Consequently, the Evidence Code requires this evidence "be viewed with distrust." (Cal. Evid. Code, § 412.)

Even more significantly, to hold that evidence of the broadcast's content is enough by itself to prove the officer actually possessed the reasonable suspicion he claimed to possess in that broadcast would effectively abolish the "fellow officer" rule. Contrary to what *Harvey-Madden* and *Whiteley-Hensley* require, the arresting/detaining officer would only have to introduce as justification to arrest/detain he heard his fellow officer broadcast. That would be enough to prove the fellow officer actually possessed the necessary probable cause/reasonable suspicion he claimed to possess. The broadcast, in effect, would be self-validating. This, of course, is the precise notion which the California courts rejected in *Harvey-Madden* and the United States Supreme Court rejected in *Whiteley-Hensley.*

Officer Brown was justified in stopping appellant's vehicle even without Officer Howe's broadcast linking that vehicle to the suspected burglary. That is, because this was an emergency situation where the officers were responding to a crime in progress Officer Brown was entitled to stop any vehicle driving on the streets anywhere near the suspected crime scene. To state this startling proposition is to refute it. No one would be safe from arbitrary police intrusion while in their cars anywhere in the state if officers could detain them everytime an anonymous tipster reported a crime in progress somewhere in the general vicinity of where they were driving.

The second and more likely, but only slightly less alarming, explanation for the majority opinion is they believe *Harvey-Madden* and *Whiteley-Hensley* somehow only apply to detentions for completed crimes and not to detentions for crimes in progress. This mysterious distinction finds absolutely no support in the cases.[6] And it defies logic. It appears they are confusing the question of the *amount* of evidence the officers must possess in the field before limiting someone's the question of whether the prosecution will have to prove much later in the courtroom whether they indeed possessed the requisite amount of evidence.

I have no call to dispute whether some lesser *quantum* of "reasonable suspicion" should be required where officers are detaining people during investigation of a "crime in progress" than is required where they are investigating a "completed crime." That simply is not the issue in this case. Whatever might be argued about not requiring as much of officers responding in the "heat of the moment" to an ongoing crime has no relevance

---

[6] The majority opinion quotes language from *Hensley* distinguishing detentions to investigate already completed crimes from those to investigate ongoing criminal activity. (Maj. opn., *ante,* at pp. 57-58.) The majority implies this means the Supreme Court does not intend the *Whiteley-Hensley* rule to apply to detentions arising out of investigations of "ongoing criminal activity." Quite the contrary. The quoted language from *Hensley* is taken out of context. It is part of the court's argument that the "fellow officer" rule applies to already completed crimes *not just ongoing criminal activity.* The court already understood it applied to investigations of crimes in progress. The defendant in *Hensley* conceded that. But he contended officers should not be allowed to detain someone on the basis of a broadcast another officer made claiming he had "reasonable suspicion" the suspect may have been involved in a "completed crime." The Supreme Court—in the paragraph the majority quoted—acknowledged there were distinctions between investigations of ongoing crimes and investigations of completed crimes. But it found those distinctions did not make a difference. In either type of investigation, an officer can detain a suspect on the basis of what he is told by another officer—so long as it is proved at the suppression hearing that the other officer actually possessed the "reasonable suspicion" he claimed. (See language from *Hensley* quoted, *ante,* at pp. 65-66 of this dissenting opinion.) So, far from supporting a departure from the "fellow officer" rule in the instance of ongoing crime investigations, *Hensley* stands foursquare for the proposition that when it comes to application of that rule there is no salient difference between ongoing crimes and completed crimes.

whatsoever to the prosecution's burden to prove the officers actually possessed the quantum of evidence required—*whatever that quantum might be*. The decision in the instant case not to produce either the dispatcher or, more critically, Officer Howe at the suppression hearing was not made in the fevered heat of the night while investigating a crime in progress. No, this decision was made during a cold, calculating dawn many months after any emergency situation and many months after there was any danger this particular suspected crime would continue.

Requiring the prosecution to produce at a court hearing those officers who possess the evidence needed to prove law enforcement indeed had reasonable suspicion to detain appellant in no sense interferes with the officers' ability to respond quickly and appropriately to ongoing crimes or to detain those whom they have reasonable suspicion to believe are involved in those crimes. And indeed unless the prosecution is required to do exactly that for detentions arising out of ongoing crimes as well as those arising out of completed crimes we will lose much of our constitutional protection against unreasonable searches and seizures. Average citizens are at least as susceptible to being detained under a claim some policeman possesses reasonable suspicion they are involved in ongoing criminal activity as they are of being detained under a claim the police possess reasonable suspicion they committed a past crime. Yet the majority opinion rules the People need not produce evidence showing the officer actually possessed the reasonable suspicion which prompted the detention in this important class of police actions. I cannot go along.

The only thing this exception can possibly accomplish is to save the prosecution and law enforcement some inconvenience and expense since they will not have to call the initiating officers as witnesses at suppression hearings arising out of "crimes in progress." But no one promised the preservation of constitutional rights would be costless. Sometimes we even have to let guilty criminals go free in order to guarantee the rights of innocent citizens to be safe from governmental intrusion. How much less burdensome on society yet equally essential to constitutional protections is the financial expense of requiring the government to fully justify every "seizure" of a citizen, including those claimed to have occurred during a "crime in progress."

It is seldom a court divides over such a fundamental issue. Indeed I cannot recall anything of equal dimension since this particular division was created. It is with reluctance that I use such strong language in connection with colleagues whom I so deeply respect. Yet I would be remiss if I did not

expose the depth and significance of our differences—for they implicate practical procedural rights which, as I see it, are essential to the continued viability of basic constitutional protections. I fear a citizenry unwilling to pay the cost of enforcing its constitutional protections in every circumstance is destined to lose those protections in all circumstances—if not immediately then most certainly over the long haul.

Appellant's petition for review by the Supreme Court was denied June 29, 1989. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.