Filed 2/10/21  P. v. Carey CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C080246 |
| Plaintiff and Respondent, | (Super. Ct. No. MF038211A) |
| v. | |
| SCOTT JOSEPH CAREY, | |
| Defendant and Appellant. | |

On July 17, 2014, the driver of an Isuzu Rodeo SUV led two Manteca Police Department detectives and other officers on a 2.6 mile vehicle pursuit through residential streets in Manteca.  Ultimately, the Isuzu slowed, the driver jumped out and fled on foot, and the Isuzu continued forward and struck a parked vehicle.  One of the detectives, who had ten prior contacts with defendant, identified him as the driver of the Isuzu.

Defendant was convicted of felony evasion of a police officer with willful or wanton disregard for the safety of persons or property (Veh. Code, § 2800.2, subd. (a); count 1) and hit-and-run resulting in property damage (Veh. Code, § 20002, subd. (a);

1

count 3). Defendant was sentenced to a term of two years in state prison on count 1. On count 3, a misdemeanor, he was sentenced to 140 days, which amounted to time served on that count.

On appeal, defendant asserts that: (1) the trial court abused its discretion in refusing to admit the audio portion of a law enforcement dashboard camera recording of the pursuit on which an officer who did not testify at trial or at the new trial motion hearing can be heard saying that the driver of the Isuzu was wearing a baseball hat, which was different from the detective who identified defendant, who testified the driver was not wearing a hat; (2) the trial court erred in denying his motion for a new trial; and (3) the trial court erred in failing to stay execution of his sentence on count 3 pursuant to Penal Code section 654.[1]

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant was charged with felony evasion of a police officer with willful or wanton disregard for the safety of persons or property (Veh. Code, § 2800.2, subd. (a); count 1), assault with a deadly weapon/assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(1); count 2), hit-and-run resulting in property damage (Veh. Code, § 20002, subd. (a); count 3), and possession of burglary tools (§ 466; count 4). Subsequently, the prosecutor stated that she was not pursuing counts 2 and 4 due to insufficiency of the evidence. The trial court granted the prosecution's request to dismiss those counts.

### The People's Case

Detectives Ranch Johnson and Jason May of the Manteca Police Department were partners assigned to the gang suppression unit, but they also regularly engaged in non-

---

[1] Further undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

2

gang-related policing.  On July 17, 2014,[2] at approximately 10:15 p.m., Johnson and May were in their unmarked Dodge Charger.  Johnson was driving and May was in the front passenger seat.  Both were wearing their marked police vests with badges.  They were stopped in downtown Manteca behind a dark green Isuzu Rodeo waiting for a train to pass.  Johnson and May noticed that the registration on the Isuzu was expired and that a trailer hitch was obscuring part of the license plate, both of which constituted Vehicle Code violations.  The detectives decided to perform an enforcement stop.  Once the train passed,  they activated the emergency lights and strobes on their car.  The vehicles proceeded over the train tracks and the Isuzu slowed and started to pull over to the side of the road, although it did not fully stop and kept creeping forward.  Johnson activated the siren on his vehicle, but the Isuzu continued to move, although very slowly.  Johnson stopped and May got out to contact the driver of the Isuzu.  The detectives had a feeling the Isuzu might flee, so Johnson stayed in the car.

May approached the Isuzu on the passenger side and told the driver to turn off the car.  There was a streetlight nearby, a well-lit gas station across the street, and the police vehicle's headlights and strobe lights were on.  As May approached, the driver of the Isuzu looked in the rearview mirror and May saw his eyes, part of his forehead, and part of his nose.  According to May, when he was approximately 17 and a half feet from the driver, the driver turned and faced May.  At that point, May had a clear, unobstructed view of the driver's face.  May immediately recognized the driver from at least 10 prior contacts, although he could not recall his name at that particular moment.  At trial, May identified defendant as the driver.

The Isuzu was still moving forward, and May yelled for the driver to turn the car off.  The Isuzu pulled away from the curb and sped away.  May ran back to the police

---

[2]  We take judicial notice that July 17, 2014, was a Thursday.  (Evid. Code, §§ 452, subd. (h), 459 subd. (a)(2); *Douglas v. Janis* (1974) 43 Cal.App.3d 931, 936.)

3

vehicle, jumped in, and Johnson pursued the Isuzu with lights and siren activated. May radioed to dispatch that they were in pursuit. At one point, the Isuzu drove onto Wilson Lane, which is a dead end. According to May, by the time he and Johnson pulled onto Wilson Lane, the Isuzu was stopped. May again got out of the vehicle to try to contact the driver. Johnson again remained in the car. The Isuzu began to perform a U-turn to reverse direction and drive out of Wilson Lane while Johnson attempted to position his vehicle to prevent the Isuzu from doing so. When the Isuzu made the U-turn, May again saw the driver's face clearly. Johnson was unsuccessful in maneuvering the police vehicle to block the Isuzu before it drove out of Wilson Lane, running a stop sign. May got back into the police vehicle again, and they continued the pursuit. The Isuzu ran at least four more stop signs during the pursuit and traveled at speeds of 45 to 50 miles per hour, although the speed limit was 25 miles per hour or less. Three or four marked police vehicles joined the pursuit.

On Michigan Avenue, the Isuzu began to slow down. The driver then jumped out of the vehicle and ran towards some houses. The Isuzu continued rolling and ran into a parked Chevy Suburban, which sustained minor damage. Johnson got out of his car and chased the driver of the Isuzu.

Johnson ran into the backyard of a residence where he thought the driver went. There, Johnson climbed on top of a fence to try to locate the driver. He saw the driver in a yard and watched him hop over a fence. Johnson did not pursue the driver further. Instead, he got on the radio and officers attempted to establish a perimeter. However, police did not apprehend the driver that night.

Johnson testified that, on the night of the pursuit, he never got a clear view of the driver. Based on his observations of the driver when the driver jumped out of the Isuzu, Johnson estimated that the driver was approximately 5 feet 7 inches tall, and weighed 150 pounds. Johnson testified that the driver was not a large person.

4

Johnson estimated that the vehicle pursuit occurred over approximately 2.6 miles. Officer Mark Rangel was on patrol and joined in the vehicle pursuit in his marked patrol vehicle. Rangel's vehicle was equipped with a video recording system, and it recorded the pursuit. A recording of the pursuit was played for the jury, without sound, and Rangel described the events depicted.

Ronald Mancia, who lived on Michigan Avenue, testified that he was in his bedroom when he heard sirens throughout the neighborhood. Mancia ran outside in time to see an SUV slowly moving toward his Suburban. Mancia saw someone bail out of the car, and then watched as the SUV drifted into his Suburban. At the same time, the driver of the SUV ran away into a neighbor's yard and jumped over a fence. Asked whether he ever saw the person who jumped out of the SUV, Mancia testified: "It was dark. I didn't really get a good view because it happened so fast. He was running away, towards me where I was standing. And I lost glimpse of him as soon as he went past my house." Mancia described the person as a tall white male. Mancia testified that his Suburban's bumper and fender were damaged.

Johnson searched the Isuzu and the registration, which indicated the vehicle was registered to Thomas Ferguson. Johnson was familiar with Ferguson from numerous prior contacts. According to Johnson, Ferguson was 5 feet 11 inches tall and weighed approximately 220 pounds. Johnson testified that the person he saw running from the Isuzu was much smaller than Ferguson.

On cross-examination, asked whether the driver was wearing a baseball hat, Johnson testified: "I believe he was wearing a hat that evening." However, Johnson further testified that he did not know if the driver was wearing a baseball hat throughout the duration of the pursuit. He was then asked, "but you know that the driver was wearing a baseball hat at some point?" Johnson responded, "At the beginning, yes." Johnson was not asked what point in time he was referencing when he said, "At the beginning." He testified they did not shine a spotlight on the Isuzu.

5

During May's cross-examination, when asked if the driver of the Isuzu was wearing a hat when he approached the Isuzu the first time, May responded: "There was no hat." May testified that he was sure about that. Asked whether the driver was wearing a hat later in the pursuit, May responded, "Not that I recall."

Approximately one hour after the pursuit, at the police department, May reviewed old case files trying to remember defendant's name. At some point, May recalled defendant's last name, looked up defendant's name in one of the police databases, and pulled up photographs. May recognized defendant as the person he saw driving the Isuzu. May testified that he was 100 percent certain defendant was the driver of the Isuzu.

In searching the police records, May found that two of the prior encounters he had with defendant were documented. Johnson testified that he was also familiar with defendant from prior contacts. May was with Johnson on at least one of those occasions. Additionally, Johnson testified he had previously known defendant to be connected to the green Isuzu involved in the pursuit. May testified he had seen defendant in the vicinity of the Isuzu on a prior occasion in the parking lot of a Motel 6 in Manteca. It was parked in front of the room defendant was staying in a couple of weeks before the pursuit.

### The Defense Case

Defendant called Detective Johnson. Defense counsel showed Johnson a photograph of an Isuzu Rodeo and asked whether it was similar to the Isuzu involved in the vehicle pursuit and how it compared to the vehicle involved in the pursuit.[3]

---

[3] In his closing argument, defense counsel suggested to the jury that the photograph of the Isuzu Rodeo demonstrated that May could not have had a clear and unobstructed view of the driver of the Isuzu as May had claimed.

6

**Verdict and Sentencing**

The jury found defendant guilty of felony evasion of a police officer with willful or wanton disregard for the safety of persons or property (Veh. Code, § 2800.2, subd. (a); count 1), and hit-and-run resulting in property damage (Veh. Code, § 20002, subd. (a); count 3).

The trial court sentenced defendant to the midterm of two years on count 1. On count 3, the trial court sentenced defendant to 140 days, giving him credit for 140 days for time served.

## DISCUSSION

### I. Refusal to Play the Audio of the Police Pursuit Recording

#### A. Additional Background

During the pursuit, an officer stated: "looks like one occupant, guys, one male occupant with a baseball cap on." The trial court ultimately precluded the audio.

Prior to the close of all evidence, outside of the presence of the jury, the trial court stated that it needed to make a record regarding this issue, which the court indicated had been discussed in chambers the previous day. The court noted that the defense had requested permission to play the law enforcement dashboard camera recording of the pursuit with audio which captured police radio transmissions. The prosecutor had objected, claiming that the audio was hearsay, and the trial court had agreed. The trial court stated there was a portion of the audio during which an officer describes the driver of the Isuzu as wearing a baseball cap. The trial court explained for the record, "we thought it was one of the two officers that had testified, either Detective May or Detective Ranch Johnson." The trial court continued: "So the intention was that you were going to be able to ask one of them if they radioed that suspect had a hat on. [¶] After counsel reviewed the video, counsel found out it wasn't one of those officers. It was another officer that the defense found out yesterday who that officer was. [¶] So we continued this until today to see if the defense could get that officer." Johnson had informed the

7

parties that the name of the officer who can be heard on the recording saying that the driver of the Isuzu was wearing a baseball hat was Officer Crowley. The trial court noted that this was potentially an important matter because May testified that the driver was not wearing a hat while Johnson testified that the driver was wearing a hat. Thus, the trial court observed that Crowley's testimony "would contradict the only witness in the People's case that identifies [defendant] as the driver."

Defense counsel stated he had been notified that Crowley was out of state and thus unavailable to testify. Counsel sought to admit Crowley's broadcast under the spontaneous statement exception to the hearsay rule set forth in Evidence Code section 1240. Counsel told the trial court that, based on information from Johnson, the officer who made the statement was stopped at a stop sign perpendicular to the pursuit and the officer made the statement as the driver drove by. Counsel asserted that the statement narrated or described an event perceived by the declarant, and it was contemporaneous with what the declarant was observing. According to defense counsel, the statement was made spontaneously while the declarant was under the stress or excitement caused by his perceptions.

The prosecutor objected to the admission of the audio portion of the recording. She emphasized that it was not clear the officer was making the statement contemporaneously with personal perceptions. She noted that in the case law she reviewed on spontaneous statements overnight, not one case involved a declarant who was a peace officer. She also emphasized that it did not appear that the officer was under any particular stress or excitement, noting, "this is his job as a law enforcement officer."

The trial court stated that it did not believe the statement qualified as a spontaneous statement, reasoning: "I don't think that it fits under spontaneous statement because I don't feel that that's a stressful event for a police officer." The court noted: "[H]e sees essentially a pursuit in progress. And I don't know if that's enough to rise to the level of a spontaneous statement." And, although defense counsel did not expressly

8

mention the contemporaneous statements hearsay objection, the court noted: "And when you look under contemporaneous statements, those are let in when you're trying to explain the conduct of the declarant and – so it doesn't fit under contemporaneous statement . . . because you're not trying to explain the conduct of the declarant."

At defense counsel's request, the trial court and the parties then played the video recording with the audio so the court could consider the officer's voice in context. After the recording was played, the court stated: "I don't hear any stress from anyone's voice," and ruled that the audio was inadmissible. The court stated it did not believe the statement fell under the spontaneous statement exception to the hearsay rule. The trial court also noted that playing the audio would not allow for the cross-examination of the declarant. The court stated that it would not admit the audio. When the jury was brought back into the courtroom, the defense rested.

We have reviewed the audio portion of the recording which was not played for the jury in addition to the video the jury saw. At 10:31:45 of the recording, the pursuit passes a patrol vehicle stopped at a stop sign perpendicular to the street on which the Isuzu was travelling. Five seconds later, at 10:31:50, a voice can be heard stating: "looks like one occupant guys, one male occupant with a baseball cap on."[4]

In the prosecutor's closing argument, she emphasized that May identified defendant, and that May testified he was 100 percent certain of his identification. The prosecutor further emphasized May's testimony that he had a clear, unobstructed view of defendant when he saw him the first time and knew defendant from previous contacts.

---

[4] We also note that, at approximately 10:32:26 of the recording, the driver of the Isuzu can briefly be seen getting out of that vehicle and running out of the frame. Upon our review of the video, we could not discern whether the driver was wearing a hat when he exited the vehicle and fled.

In his closing argument, defense counsel emphasized that the sole issue in this case was identification. Defense counsel expressed skepticism about May's testimony that he was 100 percent certain of his identification, and that he had a clear and unobstructed view of the driver of the Isuzu. Counsel also emphasized the differences in the descriptions of the driver. Specifically, defense counsel emphasized that Johnson testified the driver was wearing a hat, whereas May testified the driver was not wearing a hat. Additionally, defense counsel emphasized that May testified the driver was defendant, who was short with a slight build, whereas Mancia testified that the individual who jumped out of the SUV was tall. Based on this, counsel argued that both Johnson and Mancia contradicted May, the only person to identify defendant.

During deliberations, the jury requested and received a readback of May's testimony, and also asked to see the video. It later asked for a small portion of Johnson's testimony and it was read back as well. The following morning, the jury submitted a note to the court indicating that it was "hung in our decision on this case." Thereafter, the jury resumed deliberations and ultimately reached verdicts.

## B. Evidence Code section 1240 – Spontaneous Statements

### 1. Defendant's Contentions

Defendant asserts that the trial court abused its discretion in refusing to admit the audio portion of the recording. He maintains that Officer Crowley's broadcast fell under the spontaneous statement exception to the hearsay rule. He asserts that Crowley "immediately made the statement of seeing the driver with a baseball cap on as the vehicle pursuit was occurring." According to defendant, Crowley's statement "was instantaneous and narrated exactly what he observed; the statement was a result of the immediate influence of a police chase." Defendant further asserts that the police vehicle pursuit "was a startling occurrence such that it rendered [Crowley's] statement unreflecting," and that, despite the fact that Crowley was a police officer, a vehicle pursuit was "an exciting and stressful event." Defendant emphasizes that Crowley had no

10

reason to fabricate his statement, and the value in his statement—assisting in the pursuit of the vehicle and its driver—depended upon its accuracy.

## 2.  The Hearsay Rule and the Spontaneous Statements Exception

" 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated."  (Evid. Code, § 1200, subd. (a).)  "Except as provided by law, hearsay evidence is inadmissible."  (Evid. Code, § 1200, subds. (b), (c).)

The spontaneous statement exception to the hearsay rule is codified in Evidence Code section 1240, which provides:  "Evidence of a statement is not made inadmissible by the hearsay rule if the statement:  [¶]  (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and  [¶]  (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."

The admissibility requirements for the spontaneous statement exception to the hearsay rule are well established.  " ' "(1) [T]here must be some occurrence startling enough to produce . . . nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it." [Citations.]' [Citation.]  A statement meeting these requirements is 'considered trustworthy, and admissible at trial despite its hearsay character, because "in the stress of nervous excitement, the reflective faculties may be stilled and the utterance may become the instinctive and uninhibited expression of the speaker's actual impressions and belief." ' "  (*People v. Merriman* (2014) 60 Cal.4th 1, 64 (*Merriman*); *People v. Poggi* (1988) 45 Cal.3d 306, 318 (*Poggi*).)  "The crucial element in determining whether an out-of-court statement is admissible as a spontaneous declaration is the mental state of the speaker."  (*People v. Gutierrez* (2009) 45 Cal.4th 789, 811 (*Gutierrez*).)

"Whether an out-of-court statement meets the statutory requirements for admission as a spontaneous statement is generally a question of fact for the trial court, the determination of which involves an exercise of the court's discretion. [Citation.] We will uphold the trial court's determination of facts when they are supported by substantial evidence and review for abuse of discretion . . . ." (*Merriman, supra*, 60 Cal.4th at p. 65.)

### 3. Analysis

We accept as an offer of proof defense counsel's representation that Crowley was stopped at a stop sign perpendicular to the street on which the pursuit was taking place. The video recording, in fact, depicts a patrol unit at such a stop sign at the moment the pursuit went by and then Crowley's broadcast about the driver wearing a baseball hat is heard within the next 5 seconds. But the record does not affirmatively establish that the pursuit gave rise to "nervous excitement" in Crowley.

Defendant seems to argue that a police vehicle pursuit is necessarily an event that creates stress and nervous excitement and thus Crowley was under such stress and excitement at the time of his statement. However, all pursuits are not the same and defendant has not directed us to any case law to establish, essentially, that a police pursuit is stressful and exciting as a matter of law.

Indeed, as far as police pursuits go, from our review of the video recording, this one appears to be relatively unexciting. The speeds did not go above 50 miles per hour, and it took place on residential streets around 10:30 p.m. on a Thursday night. The video recording does not depict problematic traffic. In fact, there was almost no traffic.

More importantly, defendant did not establish that Crowley was actually participating in the pursuit, or if he was, what role he played in the pursuit or how long he was in the pursuit before making the statement. Nor did defendant provide any evidence indicating Crowley experienced stress and nervous excitement as a result. Indeed, accepting defense counsel's offer of proof, it appears that Crowley was not part of the

12

pursuit, but rather came upon it from a street running perpendicular to the pursuit route. And Crowley's voice portrays no excitement whatsoever.

Assuming arguendo that Crowley's broadcast, "Looks like one occupant guys, one male occupant with a baseball cap on," made after the Isuzu sped past his patrol vehicle was based on his own personal observation and he was not relaying information a partner or someone else gave him, defendant's request to introduce the evidence as a spontaneous statement was properly denied because he did not establish Crowley was under stress and excitement. As noted *ante*, "[t]he crucial element in determining whether an out-of-court statement is admissible as a spontaneous declaration is the mental state of the speaker." (*Gutierrez, supra*, 45 Cal.4th at p. 811.) Because defendant has failed to affirmatively demonstrate Crowley's statement was made under the stress and excitement of an exciting event, he has failed to establish it was admissible as a spontaneous statement. The trial court did not abuse its discretion in precluding this evidence at trial.

This case is nothing like *People v. Lazanis* (1989) 209 Cal.App.3d 49 (*Lazanis*), on which defendant relies. In *Lazanis*, the issue before the court was application of the *Harvey-Madden*[5] rule to the detention of the defendant that led to his arrest for driving under the influence. (*Id*. at p. 53.)

In *Lazanis*, after receiving information about a burglary in progress from a 911 caller, a dispatcher broadcast that information and Officer Howe was the first to arrive at the location. (*Lazanis, supra,* 209 Cal.App.3d at p. 52.) Howe "observed the situation" and transmitted a radio message describing a vehicle, the race of its multiple occupants, and the direction the vehicle was traveling from the scene. (*Ibid.*) Based on Howe's information, within moments, Officer Brown, the only witness to testify, stopped a vehicle matching the description. (*Ibid.*) Defendant, the driver, was intoxicated and

---

[5] *People v. Madden* (1970) 2 Cal.3d 1017; *People v. Harvey* (1958) 156 Cal.App.2d 516.

13

Brown ultimately arrested him for driving under the influence. (*Ibid*.) Because Howe did not testify, defendant argued the detention was invalid based on the *Harvey-Madden* rule.[6] The majority in *Lazanis* held that that the failure of the prosecution to call either the police dispatcher or Howe to testify to her observations did not leave the record in such state that the stop and detention of the defendant could not be legally justified. (*Id.* at pp. 57-58.)

In addition to *Harvey-Madden*, the defendant objected that Howe's broadcast was inadmissible hearsay. The majority in *Lazanis* stated that whether Howe's broadcast was

---

[6] The *Harvey-Madden* rule has been established in California to govern the manner in which the prosecution may prove the underlying grounds for arrest in suppression hearings when information supporting the arrest has been transmitted to the arresting officer through official police channels. (*People v. Collins* (1997) 59 Cal.App.4th 988, 993.) " '[A]lthough an officer may make an arrest based on information received through "official channels," the prosecution is required to show that the officer who originally furnished the information had probable cause to believe that the suspect committed a felony. … "[W]hile it may be perfectly reasonable for officers in the field to make arrests on the basis of information furnished to them by other officers, 'when it comes to justifying the total police activity in a court, the People must prove that the source of the information is something other than the imagination of an officer who does not become a witness.' [Citations.] To hold otherwise would permit the manufacture of reasonable grounds for arrest within a police department by one officer transmitting information purportedly known by him to another officer who did not know such information, without establishing under oath how the information had in fact been obtained by the former officer. [Citations.] 'If this were so, every utterance of a police officer would instantly and automatically acquire the dignity of official information; "reasonable cause" or "reasonable grounds," . . . could be conveniently fashioned out of a two-step communication; and all Fourth Amendment safeguards would dissolve as a consequence.' " ' " (*In re Richard G.* (2009) 173 Cal.App.4th 1252, 1258-1259.) "These rules undoubtedly apply to the requirement of a reasonable suspicion to detain and perform a cursory search for weapons." (*Id.* at p. 1259, citing *Lazanis, supra*, 209 Cal.App.3d 49.) For example, where the source of the information is a police dispatcher who relays a 911 report, *Harvey-Madden* would be satisfied by calling the dispatcher as a witness at the suppression hearing or by introducing the 911 call. (*People v. Brown* (2015) 61 Cal.4th 968.) No hearsay exception related to the 911 caller's statement would be required in the suppression hearing.

admitted for the truth of the matter need not be considered. (*Lazanis, supra,* 209 Cal.App.3d at p. 58.) The majority then wrote: "Even if we concede that the statement is a hearsay declaration, it qualifies for admission as a hearsay exception as a spontaneous statement, or a contemporaneous statement. Certainly the statement *explains the act* of broadcasting under section 1240, and *makes understandable the conduct* of the declarant under section 1241." (*Lazanis,* at p. 58.) But then the court wrote: "there is a much more compelling reason why this testimony is properly considered by the trial court: The parties stipulated to the admissibility of the original call of the informant and to the content of Officer Howe's broadcast." (*Id.* at pp. 58-59.)

No analysis whatsoever was provided by the *Lazanis* majority as to the foundational elements of spontaneous statements or contemporaneous statements. Indeed, the dissenting justice concluded the foundation had not been laid for either hearsay exception.[7] Given that the majority's conclusion about the hearsay exceptions was dicta related to statements that not need not have been admitted for the truth of matter and no analysis was provided as to the foundational elements for either hearsay exception, *Lazanis* is not helpful here.

---

[7] The dissenting justice, wrote: "In an attempt to make more of Officer Howe's broadcast than it deserves, the majority opinion argues it falls under two hearsay exceptions and therefore can be accepted for the truth of the statement not just to show the statement was made. However, the broadcast fails to qualify under either exception." (*Lazanis, supra,* 209 Cal.App.3d at p. 71, fn. 5 (dis. opn. of Johnson, J.).) About the spontaneous statement exception, Justice Johnson wrote: "The suggestion this broadcast is a 'spontaneous declaration' gives little credit to the professionalism of Santa Monica police officers. The key element of this hearsay exception is that it was uttered while the declarant was so excited by a startling event she was incapable of deliberating or thinking about what she observed. [Citation.] Is it reasonable to assume police officers in general -- or Officer Howe, in particular -- would suffer that level of stress merely from observing some suspects leave a warehouse in a small white car? I think not (and sincerely hope not)." (*Ibid.*)

We conclude the trial court did not abuse its discretion when it refused to allow Crowley's statement under the spontaneous statement exception to the hearsay rule.

### C. Evidence Code Section 1241 – Contemporaneous Statement

### 1. Evidence Code Section 1241 and Defendant's Contentions

Evidence Code section 1241 provides: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Is offered to explain, qualify, or make understandable conduct of the declarant; and [¶] (b) Was made while the declarant was engaged in such conduct."

Defendant asserts that Crowley's statement fell under the contemporaneous statement exception to the hearsay rule set forth in Evidence Code section 1241. He maintains that Crowley's statement "explained the conduct of broadcasting and his identification of the subject the officers were pursuing."

### 2. Analysis

Crowley's broadcast did not "explain, qualify, or make understandable conduct" of the declarant. (Evid. Code, § 1241, subd. (a).) It did not explain conduct Crowley was engaged in at the time the statement was made. It was simply a statement about an observation Crowley purportedly made. Moreover, as the comment to Evidence Code section 1241 makes clear, this section only applies when the statements accompany *equivocal or ambiguous conduct*, thus the statements are admissible to explain and make such conduct understandable. Leading commentators recognize this. (1 Witkin, Cal. Evidence (5th ed. 2020) Hearsay, § 184 ["Where a person's conduct is relevant but is equivocal or ambiguous, the statements accompanying it may be admitted to explain and make the conduct understandable. These statements have been called 'verbal acts.' "]; Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar, 4th ed.) §§ 13.12, 13.14 ["The contemporaneous-statement hearsay exception admits a declarant's statements that accompany equivocal or ambiguous conduct and tend to explain and make understandable the conduct"]; Simons, Cal. Evidence Manual (2020 ed.), §2:47 ["Where

16

a person's conduct is relevant but equivocal, a statement accompanying it may be admitted to explain and make the conduct understandable"].)[8]

We conclude that the trial court did not abuse its discretion in refusing to admit Crowley's statement under Evidence Code section 1241.

### D. Harmless Error

Even if we were to conclude the trial court abused its discretion in excluding the audio portion of the recording, we would conclude defendant did not suffer prejudice as a result.

Defendant asserts that he was prejudiced because only one witness identified him as the driver of the Isuzu, and that witness's testimony contradicted the descriptions offered by other members of law enforcement. Defendant further asserts he was deprived

---

[8] About the contemporaneous statement exception, the dissenting justice in *Lazanis* wrote the following in his dissent about Officer Howe's broadcast: "This broadcast likewise fails as a 'contemporaneous statement' which ordinarily is admissible to explain why a declarant is engaging in some transaction such as turning over a deed. [Citations.] Here the only conduct the broadcast 'makes understandable' are the acts of observing the car depart and making the broadcast itself. According to the majority's logic, the officer broadcast the suspects were leaving in a car, therefore the broadcast is admissible to 'make understandable' why she broadcast that information, that is, to show she indeed observed the 'suspects' do something suspicious and thus ordered their detention. This construction of the 'contemporaneous statement' exception would swallow the hearsay rule in one gulp. Any hearsay statement would be admissible to 'explain' or 'make understandable' why the declarant made that statement. 'You can infer the statement the declarant made is true because if he hadn't seen what he said he saw he wouldn't have said it; therefore, the statement is admissible to prove the truth of its content.' " (*Lazanis, supra,* 209 Cal.App.3d at p. 71, fn. 5 (dis. opn. of Johnson, J.).) Justice Johnson rejected application of the contemporaneous statement exception. (*Ibid.*)

California's contemporaneous statements exception is "far narrower" than its federal counterpart, the hearsay exception for present sense impressions in Federal Rules of Evidence 803(1). That federal exception applies to: "A *statement describing or explaining an event* or condition, made *while or immediately after the declarant* perceived it." (Fed. Rules of Evid., rule 803(1); Simons, Cal. Evidence Manual, *supra,* § 2:47, italics added.)

of his due process right to a fair trial by the exclusion of this evidence because it deprived him of his right to present evidence and of his fair opportunity to be heard.  The People contend that defendant's constitutional claims were forfeited by defendant's failure to raise them in the trial court.

Initially, we observe that defendant forfeited his constitutional claims by failing to raise them in the trial court.  (See *People v. Riggs* (2008) 44 Cal.4th 248, 292 [to the extent defendant raises a federal constitutional claim distinct from his claim that the trial court abused its discretion under the Evidence Code, he forfeited that claim by failing to identify that ground in his objections to the trial court].)  Even so, on this record we conclude there was no due process violation.  "Although completely excluding evidence of an accused's defense theoretically could rise to [the] level [of a due process violation], excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense.  [Citation.]  If the trial court misstepped, '[t]he trial court's ruling was an error of law merely; there was no refusal to allow [defendant] to present a defense, but only a rejection of some evidence concerning the defense.'  [Citation.]  Accordingly, the proper standard of review is that announced in" *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), "and not the stricter beyond-a-reasonable-doubt standard reserved for errors of constitutional dimension." (*People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103.)

Here, the trial court's ruling did not prevent defendant from presenting his defense.  Defense counsel cross-examined both Johnson and May on the subject of whether the driver of the Isuzu was wearing a baseball hat, and cross-examined May extensively about the circumstances surrounding his identification of defendant.  Without Crowley's broadcast, there was evidence presented to the jury contradicting May's testimony that the driver of the Isuzu was not wearing a baseball cap.  Johnson testified that he believed the driver was wearing a baseball hat, at least at "the beginning."  May, conversely, testified that he was sure "There was no hat."  Thus, conflicting testimony as

18

to whether the driver of the Isuzu was wearing a baseball cap was before the jury independent of Crowley's statement on the recording. Defense counsel argued in his closing argument that May's testimony raised "red flags" and that May was "obviously mistaken" and his testimony was "obviously false." Further, defense counsel argued that the conflict between Johnson's testimony and that of May undermined the May's testimony, the only witness to identify defendant. Thus, it is clear that defendant in fact presented the defense to which Crowley's testimony was arguably relevant. He was not prevented from presenting this defense, but was only frustrated in his effort to bolster it. Thus, we proceed to assess asserted prejudice resulting from the alleged erroneous exclusion of the subject evidence under the *Watson* standard.

Under *Watson*, we determine whether it is reasonably probable that, but for the error, the jury would have reached a result more favorable to defendant. (*Watson*, *supra*, 46 Cal.2d at pp. 835-836.) "[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 956.)

The only contested issue in this case was the identity of the driver of the Isuzu. May, the only witness to identify defendant as the driver, testified that, when he and Johnson first attempted to stop the Isuzu, he got out of their unmarked police vehicle and approached the Isuzu on the passenger side. The area was well lit. May first observed the driver in the Isuzu's rearview mirror. The driver then turned and faced May when May was approximately 17 and a half feet away. At that point, May had a clear, unobstructed view of the driver's face. May immediately recognized defendant from no fewer than 10 prior contacts with defendant, although May initially could not recall

19

defendant's name. Again on Wilson Lane, May had an opportunity to see the driver's face clearly after May again got out of the police vehicle and the driver of the Isuzu drove past him. Additionally, May testified he had seen defendant in the vicinity of the Isuzu on a prior occasion two weeks before the pursuit when the Isuzu was parked in front of a hotel room defendant was staying in at the Motel 6 in Manteca.

The exclusion of Crowley's statement was harmless, as this evidence would have been merely cumulative of Johnson's testimony that he believed the driver was wearing a baseball hat, at least at one point in time. (See *People v. Helton* (1984) 162 Cal.App.3d 1141, 1146 [any error in the exclusion of hearsay evidence was harmless where the excluded evidence was "merely cumulative of properly admitted evidence"].)

As for the purported contradiction related to Johnson and Crowley's observation, whether the driver was or was not wearing a hat at any one point of time during the pursuit which did not result in his immediate arrest hardly seems critical under the circumstances. Indeed, whether the driver was wearing a hat or not would only call into question May's credibility if all three officers made their observations at the same moment in time. If they all saw the driver at precisely the same moment and May said he was not wearing a hat whereas the other two officers saw that he was, such evidence would call into question whether May actually saw the driver or his ability to do so.

However, a hat is easily removed and put back on. And although Johnson said he saw that the driver was wearing a hat "at the beginning," he was not asked when precisely "at the beginning" he made that observation. Thus, whether Johnson made his observation of the hat at the same moment in time May said the driver was not wearing a hat is not at all clear from the evidence. What is clear from the evidence is that when May walked up to the vehicle and made his initial observation of defendant, May was in a better position to see defendant than Johnson at that time, who again, did not get out of the police vehicle and said he never got a good look at the driver. Indeed, May got a second look at defendant from a vantage point outside his car when defendant drove past

20

the detectives after making a U-turn on Wilson Lane. Johnson on the other hand, was busy trying to maneuver his vehicle to block defendant's efforts to get out of Wilson Lane.

As for Crowley, his statement was made several minutes after May had twice seen defendant. Crowley's broadcast was approximately four minutes into the recording of the police pursuit which began when defendant sped away from May and Johnson. But May was in the unmarked car following the Isuzu when, according to the offer of proof and the video, Crowley was stopped perpendicular at the intersection and purportedly made his observation as the Isuzu drove by. Based on the video recording, it is clear May was not in a position to see the driver at that time. And obviously, in the intervening time since May last saw him, the driver could have put on or taken off a baseball hat many times.

As for Mancia's statement that the person who fled from the scene was tall, that testimony has nothing to do with Crowley's statement that the driver was wearing a hat. And, in any event, Mancia testified that it was dark and he did not really get a good view of the person because it "happened so fast." He described his observation as a "glimpse," testifying, "I lost glimpse of him as soon as he went past my house." Moreover, "tall" is a relative term, and Mancia was not asked what he meant by "tall" or asked to give an approximate height of the driver. Johnson, who chased the driver estimated his height at five foot, seven inches.

We conclude that it is not reasonably probable that, had Crowley's statement been admitted under either exception to the hearsay rule, the jury would have reached a result more favorable to defendant. (*Watson, supra*, 46 Cal.2d at pp. 835-836.)

## II. Motion for New Trial

## A. Additional Background

After the jury rendered its verdict, defendant moved for a new trial. Defendant asserted that May's identification of him was mistaken and unreliable. According to

21

defendant, the trial evidence disproved May's testimony that he had a clear and unobstructed view of the driver of the Isuzu. Defendant emphasized the testimony of May and Johnson concerning the hat. According to defendant, there was "strong evidence the person driving the SUV was wearing a hat." (Fn. omitted.) He asserted that the evidence was legally insufficient to sustain the verdict.

Defendant also asserted he was entitled to a new trial based on his trial counsel's error in not discovering that Crowley was the declarant sooner which deprived him of a fair trial. Defendant recounted that his trial attorney had been mistaken in believing that Crowley's voice on the audio recording was either May's or Johnson's voice. Defendant acknowledged that immediate steps were taken to produce Crowley to testify once the mistake had been discovered, but it was too late as Crowley could not be reached to produce him as a witness. Additionally, counsel could not find a legal theory to admit the audio portion of the recording. Again, defendant emphasized that Crowley described the driver of the Isuzu as wearing a hat, which contradicted May's testimony. Defendant reiterated his contention that May was likely mistaken in his identification of defendant. Defendant also noted that Mancia described the person he saw as tall, whereas defendant was short. According to defendant, had the jury heard about Crowley's statement, the jury likely would have reached a different result. Defendant asserted that the "reason the crucial evidence was not provided was due to a mistake by defense counsel." According to defendant, his trial attorney's mistakes deprived him of the opportunity to argue that May's testimony went against the weight of the evidence. Defendant emphasized that this was a close case in which the jury indicated that it was deadlocked at one point.

Additionally, defendant stated that, after trial was completed, a juror indicated that the issue the jury focused on in deliberations was the identification of the driver, supporting his contention that evidence related to the identification of the driver "was crucial and necessary." A juror specifically told defense counsel that she had been "torn on her decision and that it was a very close case." Asked whether it would have made a

22

difference if evidence from another police officer was presented indicating that the driver of the Isuzu had been wearing a hat, this juror responded that, under such circumstances, she would have found defendant not guilty.[9] Therefore, defendant asserted, his trial attorney's error deprived him of a fair trial.

The prosecution opposed defendant's motion. The prosecutor asserted that May unequivocally identified defendant, testified that he knew defendant, and testified that he recognized him immediately. May had a clear and unobstructed view of defendant. According to the prosecution, there was nothing in the record to indicate that May's testimony was not credible. The prosecutor observed that, while Johnson testified that the driver of the Isuzu may have been wearing a hat, he also testified that he did not have a good view of the driver during the pursuit. The prosecutor argued any inconsistencies in this testimony were considered by the jury, and they were not sufficient to warrant a new trial. She maintained the jury's verdict was supported by sufficient evidence.

With regard to defendant's contention regarding his trial attorney's error, the prosecution asserted that section 1181 does not recognize "defense counsel's error" as a ground for granting a new trial. The prosecution further asserted that there was no evidence directly contradicting May's identification of defendant, and any other officer's testimony that the driver of the Isuzu was wearing a hat would not have changed the outcome of the trial. The prosecution further asserted that the evidence related to Crowley was not newly discovered evidence within the meaning of section 1181. She asserted that the recording was made available to defense counsel on March 23, 2015, dispatch and call logs were made available on March 12, 2015, and defense counsel retrieved discovery on May 19, 2015. In limine motions for the trial began on May 22

---

[9] Admission of these purported statements or the juror's testimony would have violated Evidence Code section 1150, subdivision (a). Defendant wisely does not rely on this statement on appeal.

23

and testimony in the trial began on May 27, 2015.  According to the prosecution, defense counsel had access to all of this evidence, and the associated witnesses, in advance of trial.  Lastly, even if the evidence at issue was newly discovered, the prosecutor asserted that it would have been cumulative because Johnson testified he believed the driver of the Isuzu may have been wearing a hat.

The trial court denied defendant's motion for a new trial.  Among other things, the trial court observed that the jury had before it the conflicting testimony about whether the driver of the Isuzu had been wearing a hat, and the jury nonetheless found defendant guilty, necessarily finding May's testimony credible.  The court expressed skepticism as to whether hearing from another officer that the driver was wearing a hat would have made any difference.  The trial court also stated that defense counsel had not been ineffective for failing to discover earlier the identity of the officer who said on the pursuit recording that the driver of the Isuzu was wearing a hat.

## B.  Standard of Review

The statutory grounds pursuant to which a trial court is authorized to grant a new trial are set forth in section 1181.  Among other things, those grounds include when the verdict is contrary to law or evidence, and when new, material evidence is discovered.  (§ 1181, subds. (6), (8).)  " ' " 'We review a trial court's ruling on a motion for a new trial under a deferential abuse-of-discretion standard.'  [Citations.]  ' "A trial court's ruling on a motion for new trial is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and unmistakable abuse of that discretion." ' " ' "  (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1108 (*McCurdy*).)

## C.  Analysis

### 1.  Verdict Contrary to Law or Evidence

In pertinent part, section 1181, subdivision (6), provides that a trial court may grant a defendant's application for a new trial:  "When the verdict or finding is contrary to law or evidence."

Defendant asserts that the trial court should have granted his motion for a new trial based on the conflicting evidence concerning defendant's identity as the driver of the Isuzu. Defendant asserts that sufficient credible evidence did not support the jury's verdict.

"The court extends no evidentiary deference in ruling on a 1181(6) motion for new trial. Instead, it independently examines all the evidence to determine whether it is sufficient to prove each required element beyond a reasonable doubt *to the judge*, who sits, in effect, as a '13th juror.' " (*Porter v. Superior Court* (2009) 47 Cal.4th 125, 133.) In reviewing a trial court's determination on a motion for a new trial, " '[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.' " (*People v. Verdugo* (2010) 50 Cal.4th 263, 308 (*Verdugo*).)

Here, the trial court denied defendant's new trial motion, noting, among other things, that the jury had before it conflicting evidence about whether the driver of the Isuzu was wearing a hat. Defendant's contentions with regard to what he asserted in his new trial motion was May's mistaken and unreliable identification of defendant as the driver of the Isuzu center on the conflicting testimony (and the statement of Crowley which was not admitted) as to whether the driver was wearing a hat, as well as Mancia's testimony that the driver was tall.

As discussed, there was conflicting evidence about whether the driver of the Isuzu was wearing a hat at some point. However, the existence of this conflicting evidence does not render the verdict contrary to law or the evidence. Indeed, it is reasonable to infer that defendant was wearing a hat at different times. Nor did Mancia's testimony that the driver of the Isuzu was "tall" while Johnson estimated the driver's height as 5 feet 7 inches tall render the verdict contrary to law or the evidence.

We conclude that the trial court's credibility determinations and findings on questions of historical fact are supported by substantial evidence. (*Verdugo, supra*, 50

Cal.4th at p. 308.) On this record, we conclude that the trial court's denial of defendant's new trial motion on the ground that the verdict was contrary to law or the evidence did not amount to " ' " ' "a manifest and unmistakable abuse of . . . discretion." ' " ' " (*McCurdy, supra*, 59 Cal.4th at p. 1108.)

### 2. Newly Discovered Evidence

Defendant asserts that his new trial motion should have been granted on the basis of newly discovered evidence. Section 1181, subdivision (8), provides that a trial court may grant a defendant's application for a new trial when: "new evidence is discovered material to the defendant, and which he could not, *with reasonable diligence*, have discovered and produced at the trial. When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given, and if time is required by the defendant to procure such affidavits, the court may postpone the hearing of the motion for such length of time as, under all circumstances of the case, may seem reasonable." (Italics added.)

Although defendant's new trial motion was largely premised on Crowley's statement, as the People correctly point out, defendant did not expressly argue, in his written motion or in oral argument before the trial court, for a new trial on the ground of newly discovered evidence. Thus, defendant has forfeited the contention. (*Verdugo, supra*, 50 Cal.4th at p. 309 [defendant forfeited contention that new trial motion should have been granted based on newly discovered evidence by failing to assert it below].)

In any event, the evidence did not qualify as grounds for a new trial under section 1181, subdivision (8). "In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: ' "1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at

26

the trial; and 5. That these facts be shown by the best evidence of which the case admits." ' " (*People v. Turner* (1994) 8 Cal.4th 137, 212 (*Turner*), quoting *People v. Sutton* (1887) 73 Cal. 243, 247-248 & *People v. Delgado* (1993) 5 Cal.4th 312, 328 (*Delgado*).)

First, defendant did not satisfy a key procedural step for a new trial motion on this issue. He did not provide an affidavit from Crowley. Nor did Crowley testify at the new trial hearing. Such evidence would have clarified what, if anything, Crowley saw and the circumstances in which he made any relevant observations. We simply do not know what testimony he would have provided and how that would have factored into the new trial analysis.

Second, contrary to defendant's contention, it is clear the evidence was not newly discovered evidence within the meaning of section 1181, subdivision (8). Indeed, defendant does not dispute the prosecution's representation before the trial court that the recording, and Crowley's statement on it, were previously available to the defense prior to trial. Thus, the evidence was not newly discovered; only the fact that Crowley was the declarant could be potentially characterized as "newly discovered." Further, as defendant asserts, what was newly discovered was that the essential nature of the evidence was not clear until May and Johnson testified, contradicting each other about whether the driver of the Isuzu was wearing a hat. But this argument ignores the requirement that "the evidence, and not merely its materiality, be newly discovered." (*Turner*, *supra*, 8 Cal.4th at p. 212.)

Third, as stated *ante*, Crowley's purported testimony, such as we know it, would be cumulative. The admission of Crowley's statement would be merely cumulative of Johnson's testimony that the Isuzu driver was wearing a hat. Moreover, Crowley's statement did not directly contradict May's identification of defendant as the driver of the Isuzu; it merely, arguably, contradicted May's testimony that defendant was not wearing a baseball hat when May observed the driver and thus May's testimony about seeing the

27

driver lacked credibility. But even if Crowley's statement could be interpreted as "contradict[ing] the only evidence putting [defendant] as the driver," so too could Johnson's testimony, and thus Crowley's statement would be merely cumulative.

Fourth, the fact that Crowley was the declarant could have been discovered earlier with reasonable diligence. Crowley's broadcast about the driver wearing a hat was made well into the pursuit. By that time, almost four minutes elapsed on the pursuit recording and Johnson and May had been chasing the Isuzu for some period of time before that. There would have been no reason for them to delay a broadcast about the driver wearing the hat until then. And it is clear from the video and audio recording that only seconds before that broadcast, a marked police vehicle came into view, stopping perpendicular to the pursuit at a stop sign and further that the occupants of that police vehicle may have had a view into the interior of the Isuzu. Under these circumstances, reasonable diligence warranted determining prior to trial whether it was an occupant of that patrol vehicle as opposed to Johnson and May who may have been the declarant and then securing that officer's presence for trial by subpoena.

Fifth, contrary to defendant's contention, we conclude that Crowley's statement would not have led to a different result at trial. We concluded in part I.D. of the Discussion, *ante*, that it is not reasonably probable that, had Crowley's statement been admitted, the jury would have reached a result more favorable to defendant. (*Watson, supra*, 46 Cal.2d at pp. 835-836.) For the same reasons as discussed in that section, we conclude that Crowley's statement would not render a different result probable on retrial.

As defendant points out, our high court has stated that " 'a motion for a new trial should be granted when the newly discovered evidence contradicts the strongest evidence introduced against the defendant . . . .' " (*Delgado, supra*, 5 Cal.4th at p. 329, quoting *People v. Martinez* (1984) 36 Cal.3d 816, 823.) However, we do not agree with defendant that this rule is applicable here. It is true that the strongest evidence introduced against defendant was May's identification of him as the driver of the Isuzu, about which

28

May testified he was 100 percent certain. Crowley's statement—"looks like one occupant, guys, one male occupant with a baseball cap on"—did not contradict May's identification of defendant as the driver of the Isuzu. Rather, Crowley's statement *could* only contradict May's testimony that the driver was not wearing a hat. Indeed, for all we know, Crowley might have identified defendant as the driver had he been asked to testify at the new trial hearing. More importantly, as we have already noted, there was no evidence that Crowley observed the driver at the same moment in time as did May, so that the driver was wearing a hat when Crowley saw him does not directly contradict May's observations that the driver was not wearing a hat at the points in time he saw the driver.

Thus, we conclude that the trial court would not have abused its discretion in denying the new trial motion had defendant grounded it on a claim of newly discovered evidence.

### 3. Ineffective Assistance of Counsel

Defendant asserts that the trial court erred in denying his motion for a new trial based on his claim that defense counsel was ineffective for failing to properly investigate the evidence substantiating his claim of misidentification. Defendant asserts that defense counsel should not have assumed that the voice on the audio recording was May's or Johnson's. He asserts that, but for his trial attorney's failure to investigate the recording and secure Crowley as a witness, the result at trial would have been different. We note that this contention is completely contrary to his newly discovered evidence claim on appeal -- a claim that requires a showing that reasonable diligence would not have resulted in discovering the evidence and producing it at trial.

"Although ineffective assistance of counsel is not one of the statutory grounds for granting a new trial, the issue may nonetheless be asserted as the basis for a motion for new trial." (*People v. Reed* (2010) 183 Cal.App.4th 1137, 1143; see *People v. Fosselman* (1983) 33 Cal.3d 572, 582-583.) To establish ineffective assistance of counsel, a

defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 691–692 [80 L.Ed.2d 674, 693-694, 696] (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma* ).) " 'Surmounting *Strickland*'s high bar is never an easy task.' " (*Harrington v. Richter* (2011) 562 U.S. 86, 105 [178 L.Ed.2d 624, 642] (*Richter*), quoting *Padilla v. Kentucky* (2010) 559 U.S. 356, 371 [176 L.Ed.2d 284, 297].)

If the defendant makes an insufficient showing on either prong of the test, the ineffective assistance claim fails. (*People v. Holt* (1997) 15 Cal.4th 619, 703; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1126.) Where we can dispose of an ineffective assistance of counsel claim on the grounds of prejudice, we need not address whether counsel's performance was deficient. (*In re Fields* (1990) 51 Cal.3d 1063, 1079.)

To establish prejudice, "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' " (*Richter, supra*, 562 U.S. at p. 104.) To show prejudice, defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. (*Strickland, supra*, 466 U.S. at pp. 693-694; *Ledesma, supra*, 43 Cal.3d at pp. 217-218.) The standard for *Watson* prejudice is essentially the same as the *Strickland* standard for prejudice. (*People v. Ocegueda* (2016) 247 Cal.App.4th 1393, 1407, fn. 4.) Accordingly, for the same reasons which led us to conclude in part I.D. of the Discussion, *ante*, that it is not reasonably probable that, had Crowley's statement been admitted, the jury would have reached a result more favorable to defendant (*Watson, supra*, 46 Cal.2d at p. 836), we conclude that there is not a reasonable probability that defendant would have received a more favorable result at trial had counsel earlier investigated the matter, determined that Crowley made the subject statement, and produced Crowley as a witness at trial. (*Strickland*, at pp. 693-694; *Ledesma*, at pp. 217-218.) Moreover, even had counsel managed to procure Crowley as a witness at trial to testify that he observed the

30

driver of the Isuzu wearing a baseball hat, we conclude that there is not a reasonable probability that defendant would have achieved a more favorable result.

### III.  Section 654 Error

Defendant was sentenced to 140 days on count 3, the violation of Vehicle Code section 20002, hit and run.  As for that sentence, the trial court noted "he'll be credit [*sic*] for time served . . . ."  Defendant asserts that instead, the court should have imposed and stayed the sentence on count 3 pursuant to section 654.

Section 654, subdivision (a), provides:  "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  (§ 654, subd. (a).)

"[S]ection 654 applies not only where there was but one act in the ordinary sense, but also where there was a course of conduct which violated more than one statute but nevertheless constituted an indivisible transaction.  [Citation.]  Whether a course of conduct is indivisible depends upon the intent and objective of the actor.  [Citation.]  If all the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one."  (*People v. Perez* (1979) 23 Cal.3d 545, 551; see *People v. Latimer* (1993) 5 Cal.4th 1203, 1208; *Neal v. State of California* (1960) 55 Cal.2d 11, 19.)  "On the other hand, if the evidence discloses that a defendant entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for the independent violations committed in pursuit of each objective even though the violations were parts of an otherwise indivisible course of conduct."  (*Perez*, at p. 551, fn. omitted.)  Here, it is clear defendant had but one objective when he allowed the Isuzu to crash into a parked vehicle and simultaneously fled the scene:  he was trying to evade the police.

When section 654 applies, the sentence for the lesser conviction must be imposed and execution stayed, not ordered to run concurrently or consecutively.  (*People v.*

*Deloza* (1998) 18 Cal.4th 585, 594; *People v. Alford* (2010) 180 Cal.App.4th 1463, 1468-1469 (*Alford*).)  A stayed sentence may be executed if there is a reversal of the unstayed count.  (*Alford*, at p. 1469.)

While defendant did not raise this sentencing error in the trial court, section 654 errors may be corrected on appeal even if not raised in the trial court because a sentence that violates section 654 is an unauthorized sentence.  (*People v. Hester* (2000) 22 Cal.4th 290, 295.)

However, the People assert the matter is moot, and we agree.  As noted, the purpose of imposing and staying execution of a sentence under section 654 is so that the stayed sentence may be executed if there is a reversal on appeal of the unstayed count.  (*Alford, supra,* 180 Cal.App.4th at p. 1469; *People v. Salazar* (1987) 194 Cal.App.3d 634, 640.)  Here, defendant was no longer subject to punishment for count 3 when he was sentenced because he had already served the time imposed for that count.  Indeed, even if the stayed sentence had not amounted to time served when sentence was originally pronounced, it would have long since been served before the briefing on this appeal was completed.  Even assuming there was section 654 sentencing error, returning the matter to the trial court for purpose of imposing and staying execution of the sentence on count 3 under the circumstances would serve no useful purpose.  We conclude the issue is moot.

*****

## DISPOSITION

The judgment is affirmed.


/s/
MURRAY, J.

We concur:


/s/
ROBIE, Acting P. J.


/s/
HOCH, J.